# 07 CV 2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



|  |  |
|---|---|
| **BROAD-BUSSEL FAMILY LIMITED PARTNERSHIP and CAROLINE B. GLASS, Individually and on Behalf of All Other Persons and Entities Similarly Situated,** | : <br> : <br> : <br> : <br> : |
| **Plaintiffs,** | : <br> : |
| vs. | : |
| **HENNESSEE GROUP LLC, ELIZABETH LEE HENNESSEE, and CHARLES J. GRADANTE,** | : <br> : <br> : <br> : |
| **Defendants.** | : <br> : |

**CIVIL ACTION NO.** _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

*Of Counsel*:
KOSKOFF, KOSKOFF & BIEDER, P.C.
William M. Bloss, Esq.
Neal A. DeYoung, Esq.
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
Fax: (203) 368-3244

BERGER & MONTAGUE, P.C.
Merrill G. Davidoff, Esq.
Lawrence J. Lederer, Esq.
Lane L. Vines, Esq.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Plaintiffs and the Class*

## INTRODUCTION

Plaintiffs Broad-Bussel Family Limited Partnership ("Broad-Bussel Family"), and Caroline B. Glass ("Glass") (collectively, the "Plaintiffs"), individually and on behalf of all other persons and entities similarly situated, bring this Complaint against defendants Hennessee Group LLC, Elizabeth Lee Hennessee, and Charles J. Gradante (collectively, the "Defendants"). This action is related to another case brought by plaintiff Broad-Bussel Family and other plaintiffs originally in the U.S. District Court for the District of Connecticut, which, on Broad-Bussel Family's motion, was transferred to this Court by Order of the Judicial Panel on Multidistrict Litigation dated April 18, 2006 (the "Related Bayou Class Action"). The Related Bayou Class Action is captioned Broad-Bussel Family L.P., et al. v. Bayou Group LLC, et al., No. 06 Civ. 3026 (CM) (S.D.N.Y.), which is pending before Judge McMahon of this Court as part of the multidistrict proceedings captioned In re Bayou Hedge Funds Investment Litig., 06 MDL 1755 (CM) (S.D.N.Y.).

Accordingly, Plaintiffs have filed this Complaint as a related case to the Related Bayou Class Action. In addition, Plaintiffs are also filing with this Complaint their motion to consolidate this case and the Related Bayou Class Action in accordance with Fed. R. Civ. P. 42(a).

## NATURE OF ACTION

1.      During the period between at least December 31, 1996 and August 25, 2005 (the "Class Period"), the Bayou family of hedge funds was operated and controlled by Samuel Israel, III and Daniel E. Marino. The "Bayou Hedge Funds" include Bayou Super Fund, LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, Bayou Accredited Fund, LLC, Bayou

Offshore Fund, LLC, Bayou Fund, LLC, Bayou Group LLC, Bayou Management LLC, Bayou Securities LLC, Bayou Securities, LTD, Bayou Partners LLC, Bayou Advisors, LLC, Bayou Equities, LLC, Bayou Offshore Fund A, LTD; Bayou Offshore Fund B, LTD, Bayou Offshore Fund C, LTD, Bayou Offshore Fund D, LTD, Bayou Offshore Fund E, LTD, Bayou Offshore Fund F, LTD, Bayou Offshore Master Fund, LTD, IM Partners, and IMG, LLC, (collectively with Israel and Marino, "Bayou").[1]

2.     Defendants Hennessee Group LLC is an investment advisory firm. It and its principals, Elizabeth Lee Hennessee and Charles J. Gradante (collectively, "Hennessee"), advised Plaintiffs and numerous other similarly situated investors to invest in Bayou and purported to perform due diligence in connection therewith.

3.     On August 25, 2005, the financial press began to reveal that Bayou had long been operated as a fraud, with its principals having misappropriated literally millions of investor dollars. Plaintiffs and other similarly situated investors purchased investment interests in one or more of the Bayou Hedge Funds through Hennessee during the Class Period, and were damaged thereby (the "Class"). In total, investors invested more than $450 million in the Bayou Hedge Funds during the Class Period, with millions of dollars in such investments attributable directly to the Hennessee defendants' failure to both conduct properly due diligence of the Bayou Hedge Funds and advise properly Plaintiffs and other Class member investors in connection therewith.

4.     Almost since their inception, the Bayou Hedge Funds have essentially operated as a massive financial sham and Ponzi scheme. In sum, Bayou fraudulently lured investors to invest

---

[1]     All of the Bayou Hedge Funds are presently in bankruptcy except Bayou Offshore Fund, LLC, IM Partners, IMG LLC and Israel and Marino, each of whom is named as a defendant in the Related Bayou Class Action.

and maintain hundreds of millions of dollars in the Bayou Hedge Funds during the Class Period, through a scheme of improper acts and continuing misrepresentations and omissions regarding the business practices and financial results, operations and condition of Bayou and the Bayou Hedge Funds. The Bayou entities, and in particular their principals Israel and Marino, then unlawfully pilfered and squandered hundreds of millions of dollars that investors entrusted to them as financial investments. Subsequently, both Israel and Marino have pled guilty to multiple criminal acts, and the Bayou Funds have essentially collapsed.

5.     The financial fraud and other misconduct of Bayou is alleged in the amended complaint in the Related Bayou Class Action to have been aided and abetted by several other persons and entities. In particular, Citibank, N.A. ("Citibank") is alleged to have served as Bayou's banker and, beginning in or about July 2004, improperly distributed some $16 million of what it knew were fiduciary proceeds beneficially owned by investors directly to one or more private bank accounts solely in Israel's name at Deutsche Postbank in Hamburg, Germany. Similarly, James G. Marquez ("Marquez"), Richmond-Fairfield Associates, CPA, PLLC ("Richmond-Fairfield"), Jeffrey D. Fotta ("Fotta"), Eqyty Research and Management, LLC, and Eqyty Research and Management, LTD, are alleged to be close associates of Bayou and Israel and Marino; were directly or indirectly involved in planning, orchestrating and/or executing the alleged fraud; and directly or indirectly received compensation misappropriated from Class member investors. Bayou's law firm, Faust, Rabbach & Oppenheim LLP and its principal, Steven D. Oppenheim, are alleged to have facilitated Bayou's fraud by assisting in establishing at least certain of the Bayou entities, participating in their operations, and even serving as the registered business address for some such entities.

6.    In decisions filed September 6, 2006 and January 18, 2007, the Court in the Related Bayou Class Action dismissed plaintiffs' claims against Citibank and the law firm defendants (Faust, Rabbach & Oppenheim LLP and Steven D. Oppenheim). Defendants Marquez, Fotta, Eqyty Research and Management, LLC, and Eqyty Research and Management, LTD have filed answers, and Marquez has since pleaded guilty for his role in the Bayou fraud.

7.    In a separate ruling in the Related Bayou Class Action entered January 19, 2007, the Court granted in part and denied in part the Hennessee defendants' motion to dismiss plaintiffs' claims. Plaintiffs allege that the Hennessee defendants facilitated Bayou's fraud by failing to conduct proper due diligence of Bayou and the Bayou Hedge Funds prior to recommending those investments to Plaintiffs Broad-Bussel Family, Glass, and other investors, and then by failing to monitor properly those investments. Plaintiffs and other Class member investors retained the Hennessee defendants for the express purpose of properly conducting such due diligence. However, despite the presence of numerous red flags regarding Bayou's finances, operations and principals as set forth more fully below, the Hennessee defendants failed to uncover and advise Plaintiffs and other investors of a fraud that had been occurring for years. The principals of defendant Hennessee Group, defendants Lee Hennessee and Gradante, are liable because they were the alter egos and controlled the acts of defendant Hennessee Group; personally solicited and recommended Bayou investments to Plaintiffs and other investors; personally failed to investigate properly Bayou and Bayou's principals; and received direct or indirect compensation and were unjustly enriched thereby. In addition, Lee Hennessee and Gradante also personally participated in advising and facilitating Plaintiffs and other Class member investors to invest in Bayou.

4

8.    As the fraud began to unravel internally within Bayou in July 2005, Israel sent a letter to Bayou investors informing them that Bayou was closing its businesses. Significantly, however, that letter also assured Class member investors that all of their invested funds would be distributed to them once the necessary liquidation audit was complete.

9.    On August 25, 2005 -- the end of the proposed Class Period -- *The New York Times* first alerted investors to "the possible collapse" of Bayou and the Bayou Hedge Funds. By August 29, 2005, *The Wall Street Journal* reported that a self-titled "suicide note and confession", written by Bayou's CFO Dan Marino (who did not commit suicide), had been found at Bayou's abandoned headquarters in Stamford, CT. That six-page note directly implicated Marino, Israel and others in a massive fraud on investors of the Bayou Hedge Funds dating back to 1996. Subsequent media and other reports indicate that the Bayou Hedge Funds are wholly or substantially insolvent, and that hundreds of millions of dollars of Class member investments are missing and unaccounted for -- including the some $161 million of Class member investment proceeds which Citibank distributed directly to one or more personal offshore accounts controlled solely by Israel. Substantially all of the Bayou entities have commenced bankruptcy proceedings, and millions of dollars in investor funds remain missing.

10.    Since Bayou's shocking collapse, numerous investigations have been commenced by state, federal and regulatory agencies, several lawsuits have been filed, and Bayou's two principals, Israel and Marino, have pleaded guilty to multiple criminal counts. In addition, some $101 million in suspected Bayou investor funds were allegedly seized by the Arizona Attorney General from several Wachovia Bank accounts in Flemington, New Jersey; Plaintiffs understand that those monies are the subject of civil forfeiture proceedings and presently held under the

jurisdiction of the U.S. Attorney's Office for the Southern District of New York. Plaintiffs further understand that the U.S. Attorney is likely to propose a plan to distribute those seized proceeds to injured investors. However, even assuming all such proceeds are so distributed, Class member investors will still have millions of dollars in damages on account of the Bayou fraud and the Hennessee defendants' role in connection therewith. Since Bayous' announcement in July 2005 that the Bayou Hedge Funds were being closed and liquidated, none of the Bayou Hedge Fund investments has been returned to the Plaintiffs and other members of the Class.

11.     Defendants' misconduct has caused Plaintiffs and the Class to suffer millions of dollars in damages.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction over this controversy because there is complete diversity of citizenship between the parties, and the matter in controversy, exclusive of interest and costs, exceeds the sum specified by 28 U.S.C. § 1332(a).

13.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims of Plaintiffs and the Class arise under a federal statute, the Investment Advisers Act of 1940 (the "Investment Advisers Act"), 15 U.S.C. § 80b-6 and 15 U.S.C. § 80b-15, and thus present federal question jurisdiction.

14.     This action is not preempted under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb ("SLUSA"), because, among other reasons, this case does involve "covered securities" as defined by SLUSA, 15 U.S.C. § 78bb(f)(5)(E).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). The Hennessee defendants and/or Hennessee Group are/is based in this District. Many of the acts and

transactions giving rise to the alleged violations of law occurred in this District.  In addition,

certain of the Bayou entities and their bankers and advisors maintain their principal executive

offices or residence within this District, or did so during the time of the alleged wrongdoing.

Moreover, each of the Hennessee defendants transacts business in and from this District and/or

engaged in the wrongful conduct alleged in this Complaint in and from this District, such that

maintenance of this action in this District does not offend traditional notions of fair play and

substantial justice.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

the Hennessee defendants, directly and indirectly, used the means and instrumentalities of

interstate commerce including the mail, the Internet and telephone communications.

## THE PARTIES

### The Plaintiffs

17.    Plaintiff Broad-Bussel Family is a limited partnership organized under the laws of

North Carolina with registered offices located in Chapel Hill, North Carolina.  During the Class

Period, the Broad-Bussel Family invested in the Bayou Hedge Funds based on the advice of the

Hennessee defendants and was damaged as a result of Defendants' misconduct.

18.    Plaintiff Glass is a citizen of New Jersey.  During the Class Period, plaintiff Glass

invested in the Bayou Hedge Funds based on the advice of the Hennessee defendants and was

damaged as a result of Defendants' misconduct.

### The Defendants

19.    Defendant Hennessee Group (d/b/a Hennessee Hedge Fund Advisory Group) is a

limited liability company organized under the laws of New York which was formed in or about

March 1997.  Hennessee Group has principal offices at 500 Fifth Avenue, 47th Floor, New York, NY.

      a.      Hennessee Group is a registered investment adviser that consults hedge fund investors on asset allocation, manager selection, ongoing monitoring of hedge fund managers and asset reallocation.  In its role as a hedge fund consultant, Hennessee Group funneled tens of millions of dollars to Bayou by advising numerous of its clients to invest in the Bayou Hedge Funds and by facilitating those investments.

      b.      The Hennessee Group charged Plaintiffs Broad-Bussel Family and Glass, and other similarly situated investors, advisory and other fees for its services.

      20.      Defendant Lee Hennessee was, at times relevant, a Managing Principal of the Hennessee Group.  Lee Hennessee is a citizen of New York and resides at 45 Sutton Place in New York City.

      a.      In her role with the Hennessee Group, Lee Hennessee touted, among other things, that she "focuses on manager selection and client services development, sharing overall management with Mr. Gradante."

      b.      Lee Hennessee co-founded the Hennessee Group with defendant Gradante in 1997.  Lee Hennessee directed a division of E.F. Hutton and worked for Shearson Lehman, Republic National Bank and Weiss, Peck and Greer from 1987 to 1997.  Prior to that time, she worked for Thomson McKinnon Securities where she performed institutional and retail sales from 1976 to 1987.  Defendant Lee Hennessee claims that she has been "Series 3 and 7 registered since 1976 and also holds Series 24, Series 65 and Series 63 registrations."

21.    Defendant Gradante was, at times relevant, a Managing Principal of the Hennessee Group. Gradante is a citizen of New York and resides at 45 Sutton Place in New York City.

a.    In his role with the Hennessee Group, defendant Gradante claimed that he "focuses on research, market analysis, risk management and portfolio design" and specifically boasts that he "brings 'hands-on' experience in risk management, portfolio analysis, trading and venture capital."

b.    Prior to co-founding the Hennessee Group in 1997, defendant Gradante had a twenty-five year financial industry career, during which he held executive positions in the banking and securities industries, including as President and CEO of Union Chelsea National Bank, Group Marketing Manager at Citibank and Chair of the Risk Management Committee of Drexel Burnham Lambert, where he was responsible for Trading Administration. Defendant Gradante claims to hold a Series 65 registration.

22.    As a result of their positions and roles as principals and officers of the Hennessee Group, defendants Lee Hennessee and Gradante controlled the business operations and practices of the Hennessee Group.

23.    The Hennessee defendants had fiduciary and other duties and obligations to be truthful and deal honestly and fairly with Plaintiffs and the other Class member investor clients who retained the Hennessee defendants expressly to render such investment advisory services. Among other things, those duties required the Hennessee defendants to conduct proper due diligence and monitoring of the investments they recommended to Plaintiffs and their other similarly situated client investors. Plaintiffs and other such investors specifically relied upon the

9

Hennessee defendants to perform properly such investigation and monitoring. However, the Hennessee defendants failed to perform their obligations, ignoring or failing to uncover numerous red flags with regard to the Bayou Hedge Funds which should have been properly investigated and timely reported to Plaintiffs and the Hennessee defendants' other client investors, all as described more fully below.

## OTHER RELEVANT PERSONS AND ENTITIES

### The Bayou Entities

24.    Bayou Group LLC ("Bayou Group") is a limited liability company organized under the laws of Connecticut and has principal offices located at 40 Signal Road, Stamford, CT. Corporate records list Israel and Fotta as being Principals and Members of Bayou Group. The Bayou Group has, or at times relevant during the Class Period had, controlling and/or other equity interests in one or more of the other Bayou entities and/or helped create, operate and control the Bayou Hedge Funds. The email domain used by the Bayou entities during the Class Period was <<www.bayougroup.com>>. The registrant of this email domain is Bayou Securities. This email domain was used by Bayou for both internal email at the 40 Signal Road address in Stamford (*e.g.*, info@bayougroup.com, podwyer@bayougroup.com), and for external email addresses, such as those for promoters and agents of Bayou, including but not limited to Howard Kra (*e.g.*, hkra@bayougroup.com).

25.    The Bayou Hedge Funds include the following funds, among others:

a.    Bayou Fund, LLC ("Bayou Fund"), which is a limited liability company organized under the laws of New York and has principal offices at 40 Signal Road, Stamford, CT;

b.    Bayou Super Fund, LLC ("Bayou Super Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

c.    Bayou No Leverage Fund, LLC ("Bayou No Leverage Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

d.    Bayou Affiliates Fund, LLC ("Bayou Affiliates Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

e.    Bayou Accredited Fund, LLC ("Bayou Accredited Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT; and

f.    Bayou Offshore Fund, LLC, which is a company incorporated under the laws of the Delaware.

26.    Bayou Management LLC ("Bayou Management") is a limited liability company organized under the laws of New York and has principal offices at Bayou's law firm, Faust Rabbach & Oppenheim LLP, 488 Madison Avenue, New York, NY ("Faust Rabbach & Oppenheim"), and at 40 Signal Road, Stamford, CT.  Bayou Management served as the investment advisor to, and manager of, the Bayou Hedge Funds.  Bayou Management maintained primary bank accounts at Citibank and additional accounts at Wachovia Bank.

27.    Bayou Partners LLC ("Bayou Partners") is a company with principal offices at both 40 Signal Road, Stamford, CT and 27 Beaver Place, Boston, MA -- the home residence of

11

Fotta. Bayou Partners was involved in soliciting investment funds from members of the Class and other prospective Bayou investors, including specifically at investor conferences held in Miami, FL in October 2000 and in Monte Carlo, Monaco in September 2000. According to its own investment literature, Bayou Partners purported to provide "advisory services to managers and investors in the alternative sector" and "specializes in identifying emerging managers ($25-500 Mill.) and positioning them in institutional investment portfolios, either through structuring multi-manager product or direct allocation."

28.    Bayou Advisors, LLC ("Bayou Advisors") is a Delaware limited liability company also with principal offices at Faust Rabbach & Oppenheim, and a mailing address at 40 Signal Road, Stamford, CT. Bayou Advisors was formed in or about January 2001.

29.    Bayou Equities, LLC ("Bayou Equities") is a Delaware limited liability company also with principal offices at Faust Rabbach & Oppenheim, and a mailing address at 40 Signal Road, Stamford, CT. Bayou Equities was formed in or about January 2001.

30.    Bayou Securities LLC and Bayou Securities, LTD are collectively referred to as Bayou Securities.

a.    Bayou Securities LLC is a limited liability company organized under the laws of New York in or about May 1997 and has principal offices located at 40 Signal Road, Stamford, CT. Bayou Securities LLC is a broker-dealer registered with the National Association of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC"), and, upon information and belief, is the successor-in-interest to Bayou Securities, LTD, a Delaware corporation. Bayou Securities, LTD was formed in or about January 1996 with principal offices located at 31 Buckout Road, West Harrison, NY.

b.       Bayou Securities performed securities brokerage and trading services for the Bayou Hedge Funds. Israel was the President and sole owner of Bayou Securities. During the Class Period, Israel and Marquez oversaw the operations of Bayou Securities and directed the securities trades for the Bayou Hedge Funds, engaging in a "strategy" that involved buying and selling tens of millions of dollars of securities on a nearly daily basis, akin to day trading. While these securities trades generally resulted in significant losses, those trades yielded enormous commissions for Bayou Securities, from which Israel, Marino and Marquez paid themselves substantial annual salaries and profit distributions. Moreover, even occasionally profitable trades resulted in net losses because of the high commissions charged by Bayou Securities. For example, in 2003 alone, the Bayou Hedge Funds *suffered losses of some $49 million*; however, Bayou Securities *earned approximately $29 million in commissions*.

31.    The following seven Bayou entities (the "Bayou Offshore Entities") are part of the Bayou family of funds:

a.       Bayou Offshore Fund A, LTD ("Bayou Offshore Fund A"), which is a company incorporated under the laws of the Cayman Islands;

b.       Bayou Offshore Fund B, LTD ("Bayou Offshore Fund B"), which is a company incorporated under the laws of the Cayman Islands;

c.       Bayou Offshore Fund C, LTD ("Bayou Offshore Fund C"), which is a company incorporated under the laws of the Cayman Islands;

d.       Bayou Offshore Fund D, LTD ("Bayou Offshore Fund D"), which is a company incorporated under the laws of the Cayman Islands;

13

e.     Bayou Offshore Fund E, LTD ("Bayou Offshore Fund E"), which is a company incorporated under the laws of the Cayman Islands;

f.     Bayou Offshore Fund F, LTD ("Bayou Offshore Fund F"), which is a company incorporated under the laws of the Cayman Islands; and

g.     Bayou Offshore Master Fund, LTD ("Bayou Offshore Master Fund"), which is a company incorporated under the laws of the Cayman Islands.

32.    IM Partners ("IM Partners") is a general partnership organized under the laws of Connecticut with principal offices at 40 Signal Road, Stamford, CT. During the Class Period, Israel and Marino created IM Partners to directly participate in converting and laundering Class member investor funds. Israel and Marino then used IM Partners to, among other things, invest those wrongfully converted funds in private companies located in Europe, the United States and possibly elsewhere, including reportedly a $10 million investment in Kycos Ltd. in or about 2003, and a $2 million investment in Debit Direct Ltd. beginning in or about November 2003.

33.    IMG, LLC ("IMG") is a limited liability company organized under the laws of Connecticut with principal offices at 40 Signal Road, Stamford, CT. Israel and Marino created IMG in or about November 2002. According to state regulatory filings, Marino is listed as a Principal and Member of IMG. Like IM Partners, Israel and Marino created IMG to participate in their scheme to unlawfully convert Class member investor funds from the Bayou Hedge Funds.

34.    Israel is and was, at all times relevant, a founder and principal of the Bayou Group, Bayou Management, Bayou Securities, Bayou Partners, Bayou Advisors, Bayou Equities and the Bayou Hedge Funds. He is the sole owner of Bayou Management and Bayou Securities.

14

He is also the Chief Executive Officer and Chief Investment Officer of Bayou Management, and as such, was responsible for the investment management and operations of Bayou. Israel is a citizen of New York and resides at 52 Oregon Road, Mt. Kisco, NY. Israel is scheduled to be sentenced in connection with his role in the Bayou fraud in April of 2007.

35.     Marino is and was, at all times relevant, the Chief Financial Officer and Chief Operating Officer of Bayou, including Bayou Group and Bayou Management, and was a fund manager for the Bayou Hedge Funds. Marino is also the owner and registrant for Richmond-Fairfield. Marino is a citizen of Connecticut and resides at 261 Bayberry Lane, Westport, CT. He is a Certified Public Accountant, having received his license in 1990 in the State of New York. Prior to his involvement with Bayou, Marino worked at several securities brokers, as well as in the audit departments at two accounting firms, Coopers & Lybrand LLP and Spicer & Oppenheim. Marino is scheduled to be sentenced in connection with his role in the Bayou fraud in April of 2007.

36.     As a result of their positions and roles as principals and officers of the various Bayou entities, Israel and Marino controlled the financial operations, business practices and assets of Bayou and the Bayou Hedge Funds.

37.     As a result of their positions and roles as principals and officers of the various Bayou entities, Israel and Marino owed fiduciary and other duties to the Plaintiffs and the members of the Class. Among other things, those duties required Israel and Marino to safeguard and protect the Class' investments in the Bayou Hedge Funds, to properly manage Class member investor funds as faithful fiduciaries, and to be truthful and deal honestly and fairly with the Plaintiffs and the Class.

38.     The Bayou entities and Israel and Marino were also bound to act in good faith by the contracts that were entered into with members of the Class governing Class member investments in the Bayou Hedge Funds. These agreements, which typically were called Operating Agreements and Subscription Agreements, had uniform terms governing the parties' relationship. For example, these agreements uniformly obligated Bayou to ensure the accuracy of the Net Asset Valuations and other reports the Bayou Hedge Funds distributed to the Class. Israel and Marino controlled each of the Bayou entities and thus had the ability and opportunity to prevent the issuance of such reports if such reports were inaccurate or to promptly correct same. In addition, Israel and Marino had unfettered access to the true financial results, operations and condition of the Bayou Hedge Funds. Nevertheless, Israel and Marino directed the Bayou entities' wrongdoing alleged here and knowingly disseminated false and material statements and omissions regarding the financial results, operations and condition of the Bayou Hedge Funds.

**James Marquez**

39.     Marquez was, at times relevant, a principal and co-founder of Bayou Securities and the Bayou Hedge Funds with Israel. In addition, Marquez oversaw the operations of Bayou Securities. Reportedly, Marquez left Bayou in 2004 as it was plunging into insolvency.

a.     According to media reports, Marquez had long been a mentor to Israel, and Israel became a protégé of Marquez. Marquez and Israel began their relationship in the mid-1980s at F.J. Graber & Co., a small stock-trading firm. At the time, Israel was a young clerk on the trading desk, fresh from Tulane University, and the grandson of legendary commodities

16

trader, Samuel Israel, Jr. By contrast, Marquez was a well-known former arbitrage trader who had managed money for hedge fund managers George Soros and Michael Steinhardt.

b.     In 1990, Marquez founded a hedge fund called JGM Management ("JGM"). In 1991, Marquez hired Israel to trade stocks for JGM; Marino was hired as the fund's controller. According to a March 1993 *Wall Street Journal* article, the JGM fund was down 40% in 1992; JGM never recouped its losses and was shut down in 1993.

c.     Marino, Israel and Marquez have also previously worked together at another hedge fund called HMR Investors, Limited Partnership (a/k/a Highly Motivated Research) ("HMR Investors"). HMR Investors is a Delaware limited partnership with principal offices at 405 Park Ave., New York, NY; Marquez and his wife, Mariella, are the General Partners of HMR Investors.

d.     On or about December 14, 2006, Marquez pleaded guilty to certain acts in connection with his role at Bayou. Marquez is scheduled to be sentenced in March of 2007.

**<u>Richmond-Fairfield</u>**

40.     Richmond-Fairfield (a/k/a Richmond-Fairfield CPA Services, PLLC) was, at times relevant, the purported outside accountant and auditor for Bayou and the Bayou Hedge Funds.

a.     Richmond-Fairfield is a limited liability company organized under the laws of New York. Bayou and Israel and Marino falsely portrayed Richmond-Fairfield as being a legitimate public accounting firm with offices located at 575 Madison Avenue, Suite 1006, New York, NY that performed independent financial audits of Bayou.

17

b.      In actuality, Richmond-Fairfield was a sham company set up by Marino on or about October 10, 2000 as part of the Bayou's fraudulent scheme to misappropriate Class member assets.  Corporate records for Richmond-Fairfield list Marino as the sole owner and report registered offices located at 111 John Street, #1720, New York, NY.

**Jeffrey Fotta/Eqyty Research**

41.      Fotta was, at times relevant, a Principal and Member of the Bayou Group, according to the Connecticut Secretary of State's Commercial Recording Division.  Fotta is also a principal or agent for Bayou Partners and Bayou Securities.  On or about October 11, 2005, a so-called Interim Notice was filed with the Connecticut Secretary of State, by or on behalf of Fotta, to remove Fotta's name as a Principal and Member of the Bayou Group -- in an attempt to conceal his involvement and relationship with Bayou.

a.      Fotta is a citizen of Massachusetts and resides at 73 Mount Vernon St., Boston, MA.  Fotta also has or had a residence at 27 Beaver Place, Boston, MA.  In addition, Fotta maintains telephone listings at the 27 Beaver Place residence for Bayou Partners and Bayou Securities, as well as for Ernst Research and Management, LLC (n/k/a Eqyty Research and Management, LLC).

b.      Fotta is also a co-founder and Managing Partner of Eqyty Research and Management, LLC and is a principal of Eqyty Research and Management, LTD (collectively, "Eqyty Research").  From 2003 to 2005, Eqyty Research received at least $700,000 from Bayou Securities.  According to a September 17, 2005 article in *The New York Times*, Fotta claimed that "the payments were for research on stocks" for Bayou through May 2005.  However and in fact, Bayou halted all stock trades and liquidated the Bayou Hedge Funds in or about April 2004.

Indeed, the $700,000 payment to Eqyty Research was one of the means pursuant to which Fotta participated in, and personally benefitted from, the Bayou's misappropriation of Class member investor assets.

42.     Eqyty Research and Management, LLC and Eqyty Research and Management, LTD are collectively referred to as Eqyty Research.

a.     Eqyty Research and Management, LLC is a limited liability company organized under the laws of Massachusetts and has principal offices located at 27 Beaver Place, Boston, MA. According to state regulatory records, Eqyty Research was formerly known as Ernst Institutional Research; that name change occurred on July 16, 2003. Prior to that time, Eqyty Research was known as Ernst Research and Management, LLC.

b.     Eqyty Research and Management, LTD is a corporation with principal offices located in Tortola, British Virgin Islands and a mailing address of 27 Beaver Place, Boston, MA. Eqyty Research and Management, LTD is registered as an Investment Advisor with the NASD and the SEC.

c.     According to a February 15, 2000 media report on *SmartMoney.com*, Fotta and Eqyty Research touted themselves as experts in the field of fundamental analysis of equities securities and supposedly pioneered a novel approach to analyzing companies based on cash flow, known as a "dual cash flow" screen. This analytical approach supposedly "has a proven record as an early warning system for companies whose earnings may be about to change." Morever, that analytical approach allegedly allows "investors [to] spot companies with real potential" by focusing on "the sustainability of earnings growth by getting a handle on how much

cash flow is actually generated by paying customers and how much is being contrived by balance-sheet manipulations."

**Citibank**

43.    Citibank is a nationally chartered bank with its principal place of business at 399 Park Avenue, New York, NY.  Citibank is a subsidiary of Citigroup, Inc., a Delaware corporation with principal offices located at 399 Park Ave, New York, NY.

a.    Citibank served as a principal banker for Israel and the Bayou Hedge Funds.  Among other things, Citibank held several of Bayou's bank accounts during the Class Period; received millions of dollars in deposits from Bayou investors includes Class members; transferred millions of dollars in investor dollars for securities trading and other transactions; and knew that the proceeds it had on deposit in Bayou accounts were fiduciary proceeds beneficially owned by Class members and other Bayou investors.  Citibank specifically held bank accounts in the name of, among others, Bayou Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund, Bayou Accredited Fund and Bayou Management.

b.    During the Class Period, Citibank received deposits directly from members of the Class that were specifically designated as being investments in the Bayou Hedge Funds.  Citibank also participated in transferring and receiving Class member funds from or relating to the securities trading activities directed by Israel, Marino and Marquez.  For example, Citibank transferred investor funds to, and received funds from, Spear, Leeds & Kellogg, L.P., which served as Bayou's lead securities trading and clearing firm, as described more fully below.

c.    Citibank knew or disregarded that the Bayou accounts it held represented fiduciary funds owned by Bayou investors.  Nevertheless, at the request of Israel, in or about July

2004 Citibank allowed Israel to withdraw some $161 million from the five Bayou bank accounts that were held at Citibank in New York -- thereby completely draining those accounts -- and transferred some or all of such proceeds directly to Israel care of one or more offshore bank accounts solely in Israel's own name maintained at Deutsche Postbank in Hamburg, Germany.

**Faust Rabbach & Oppenheim**

44.    Faust Rabbach & Oppenheim is a limited liability partnership organized under the laws of New York with registered offices located at 488 Madison Avenue, New York, NY. Faust Rabbach & Oppenheim served as counsel for Bayou during all or some of the Class Period and was otherwise substantially involved in facilitating the operations of Bayou. Indeed, during the Class Period, Bayou Management, Bayou Advisors and Bayou Equities actually maintained their principal place of business at Faust Rabbach & Oppenheim's offices in New York City.

45.    Steven D. Oppenheim ("Oppenheim ") is a partner and member of Faust Rabbach & Oppenheim and served as counsel for Bayou during all or some of the Class Period. He is a citizen of New York and resides at 14 Senaca Trail in Harrison, New York.

a.    Oppenheim is both an attorney and a Certified Public Accountant, having received his CPA license in 1965 in the State of New York. In April 2005, he was elected to serve as a Governor of the American Stock Exchange.

b.    Prior to his law practice as a named partner of Faust Rabbach & Oppenheim, Oppenheim was the managing partner of Spicer & Oppenheim, an eight-office, 100-partner accounting firm that disbanded in or about December 1990; at that time, Spicer & Oppenheim was the nation's 15th largest accounting firm. According to media reports, the

securities industry accounted for about 40% of Spicer & Oppenheim's business, which was

crippled in 1987 by the Black Monday crash of the stock market.

      c.     Following the dissolution of Spicer & Oppenheim, Oppenheim and most

of his New York office joined the accounting firm of Grant Thornton, which served as Bayou's

auditor until in or about 1998. Bayou, however, continued to falsely tell investors as late as 2002

that Grant Thornton audited Bayou's books.

      d.     In late 1991, Oppenheim left Grant Thornton to join Faust, Rabbach &

Stranger as a tax lawyer. After leaving Grant Thornton, Oppenheim continued a personal

business relationship with that firm. According to a September 23, 1991 article in <u>Accounting</u>

<u>Today</u>, Oppenheim said at the time that "he and his family would retain Grant Thornton as

accountant for certain entities, which he would not identify, that they control."

      46.    During the Class Period, Faust Rabbach & Oppenheim and Oppenheim personally

provided counsel and advice to Bayou in planning, forming and operating the fraudulent Bayou

Hedge Funds. In doing so, Oppenheim acted on behalf of, and in the interests of, Faust Rabbach

& Oppenheim.

**Goldman Sachs Execution and Clearing, L.P.**

      47.    Goldman Sachs Execution and Clearing, L.P. (f/k/a Spear, Leeds & Kellogg, L.P.)

("Spear Leeds") is a New York limited partnership with principal offices located at One New

York Plaza, New York, NY.

      a.     Spear Leeds is registered as a U.S. broker-dealer and futures commission

merchant and provides a wide range of brokerage and investment services, including, among

other things: floor-based and electronic market making as a specialist on U.S. equities

exchanges; facilitating and financing transactions with a diverse group of corporations, financial institutions, government and individuals; and executing and clearing customer transactions on major stock, options and futures exchanges worldwide. Spear Leeds held itself out as being a reputable, honest and experienced broker-dealer.

      b.    Spear Leeds served as a securities trading agent for Bayou Management, Bayou Securities and the Bayou Hedge Funds. In that capacity, Spear Leeds maintained one or more capital trading accounts for Bayou, processed securities trading instructions from Bayou's principals, including Israel, Marino and Marquez, and engaged in actual securities trading for Bayou.

      c.    Spear Leeds also acted as the clearing firm for Bayou's securities transactions and transferred securities and cash proceeds to and from Bayou accounts including at Citibank in connection therewith. Spear Leeds' clearing responsibilities include, among other things: receiving and delivering funds from or to the customer; maintaining records that reflect the transaction; and safeguarding the funds in the customer's account.

**Kenneth E. Stocker**

48.    Kenneth Stocker was, at relevant times, a principal and Managing Director of Bayou Management and a Partner of Bayou Partners. In addition, Mr. Stocker was part of the hedge fund advisory team, along with Kathleen McLaren Williams, which advised Bayou Management and the Bayou Hedge Funds. Mr. Stocker was also a direct marketer of the Bayou Hedge Funds. Among other things, Mr. Stocker acted as intermediary between Bayou and the institutional investor community. For example, Mr. Stocker acted as the Bayou representative for investor conferences held in Scottsdale, Arizona in January 2001; Miami, FL in October

2000; and Monte Carlo, Monaco in September 2000 -- the latter being a conference that was

personally attended by Fotta.  Mr. Stocker reportedly left Bayou in or about June 2002 to become

a Managing Director of Northeast Alternative Strategies in New York City, a then newly-created

division of Northeast Securities, Inc. which serves institutional hedge funds.

**Kathleen McLaren Williams**

49.    Kathleen McLaren Williams was, at relevant times, part of the hedge fund

advisory team, along with Kenneth Stocker, which advised Bayou Management and the Bayou

Hedge Funds.  Ms. Williams reportedly left Bayou with Kenneth Stocker in or about June 2002

to become a Managing Director of Northeast Alternative Strategies in Boston, MA.

**Chris D'Amore**

50.    Beginning in or about June 2002, Chris D'Amore became a direct marketer for the

Bayou Hedge Funds, and thereby participated in directly soliciting members of the Class and

other prospective Bayou investors to invest in the Bayou Hedge Funds. Mr. D'Amore replaced

Kenneth Stocker who had previously acted as one of Bayou's direct marketers.  Prior to working

for Bayou, Mr. D'Amore was a marketer for the San Francisco-based hedge fund RS Investment

Management.

## CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action on behalf of themselves and a Class of persons who,

during the Class Period December 31, 1996 through August 25, 2005, were advised to invest in,

and invested in or maintained investments in, any of the Bayou Hedge Funds pursuant an

investment advisory relationship with the Hennessee Group, and suffered damages thereby.

Excluded from the Class are:  the Defendants; the principals, officers and directors of the

24

Defendants; the members of the immediate families of any of the foregoing persons; any entity in which any Defendant has a controlling interest; other persons and entities who directly or indirectly participated in the wrongdoing alleged; and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest and assigns of any such excluded person or entity.

52.     This action is properly maintainable as a Class action on behalf of the members of the Class under Fed. R. Civ. P. 23(a) and (b)(3) because:

(a)     During the relevant period, numerous investors retained the Hennessee defendants to render financial advisory services and, based on such advice, invested millions of dollars in the Bayou Hedge Funds.  For example, in addition to Plaintiffs, several other investors who were allegedly advised by Hennessee to invest in Bayou have already filed indvidual actions against Hennessee, including South Cherry Street, LLC v. Hennessee Group LLC, et al., No. 06-cv-2943-CM (S.D.N.Y.) and DePauw University v. Hennessee Group, LLC, et al., No. 06-cv-3028-CM (S.D.N.Y.) both of which are pending in this District.  Although the exact number is presently unknown to Plaintiffs and can be ascertained only following appropriate discovery, Plaintiffs believe that there are many similarly situated investors who were advised wrongfully by Hennessee to invest in one or more of the Bayou Hedge Funds.  Moreover, such investors are geographically dispersed throughout the United States.  Accordingly, the members of the Class are so numerous that joinder of all such members is impracticable.

(b)     Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and all members of the Class similarly retained Hennessee to render financial advisory services.  Plaintiffs and all Class members also similarly made investments in one or

more of the Bayou Hedge Funds as a result of the financial advice of the Hennessee Defendants. Plaintiffs and all members of the Class similarly relied on the veracity and expertise of the Hennessee defendants' acts and practices in properly investigating the Bayou Hedge Funds, and were similarly damaged as a result.

(c)     Plaintiffs are representative parties who will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class action litigation.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Class, because joinder of all members of the Class is either impracticable, or would entail duplicative litigation and significantly increased costs to the parties and the judiciary. Furthermore, although the damages suffered by Plaintiffs and other individual members of the Class may be substantial, the expense and burden of individual litigation render class treatment far superior to individual litigation in the circumstances here. Moreover, the likelihood of all of the individual members of the Class prosecuting separate claims is remote, would result in increased litigation costs, and would be an inefficient use of judicial resources in any event.

(e)     Plaintiffs anticipate no unusual difficulties in the management of this action which would preclude its maintenance as a class action.

(f)     Common questions of law and fact predominate over any questions affecting any individual members of the Class. The questions of law and fact which are common to Plaintiffs and the members of the Class include, among others:

26

(i)      Whether the acts and omissions of the Defendants violated the law as alleged;

(ii)      Whether the Defendants engaged in fiduciary and other breaches of obligations owed, respectively, to Plaintiffs and to the other members of the Class;

(iii)      Whether the Defendants breached Hennessee Group's investment advisory agreements with Class member investors;

(iv)      Whether the Defendants breached the implied covenant of good faith and fair dealing inherent in Hennessee's investment advisory agreements with Class member investors;

(v)      Whether the Defendants failed to investigate properly Bayou and the Bayou Hedge Funds prior to recommending investments in the Bayou Hedge Funds;

(vi)      Whether the Defendants failed to monitor properly the Class' investments in Bayou and the Bayou Hedge Funds; and

(vii)      Whether the Plaintiffs and the other members of the Class have sustained damages and, if so, the extent of such damages.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

### The Class Invests in the Bayou Hedge Funds

53.      In seeking to attract investors to the Bayou Hedge Funds, Bayou provided prospective investors, including Plaintiffs and members of the Class, with the Bayou Hedge Funds' offering memoranda, subscription agreements, operating agreements and other general marketing materials.

27

54.     Investments in the Bayou Hedge Funds by Class members were typically contracted for pursuant to a so-called Subscription Agreement with Bayou Management (the "Subscription Agreement"). The Subscription Agreement provided for the Class member's initial purchase of an interest in one or more of the Bayou Hedge Funds. In addition, Class members and Bayou Management entered into a separate agreement known as the Operating Agreement (the "Operating Agreement").

55.     The material terms of the Bayou Operating Agreements were uniform, although each Operating Agreement was also specific to the particular Bayou fund the Class member invested in. For example, Bayou's standard form Operating Agreement specifically obligated Bayou Management in its role as the manager of the Bayou Hedge Funds, among other things:

    a.     to keep "[p]roper and complete records and books of account";

    b.     to account "fully and accurately [for] all transactions and other matters";

    c.     to compute all "profits and losses of the [Bayou Hedge Fund] ... in accordance with Generally Accepted Accounting Principles applied on a consistent basis using mark-to-market method of accounting";[2]

    d.     to maintain sufficient "procedures and internal controls reasonably designed to prevent the use of the Fund for money laundering purposes"; and

---

[2]     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures that define accepted accounting practice at a particular time. GAAP includes, among other things: FASB (Financial Accounting Standards Board) Statements of Financial Accounting Standards ("FAS"); FASB Interpretations ("FIN"); Accounting Principles Board Opinions ("APB"); American Institute of Certified Public Accountants ("AICPA") Accounting Research Bulletins ("ARB"); AICPA Statements of Position ("SOP"); Consensus Positions of FASB Emerging Issues Task Force ("EITF"); and FASB Concept Statements ("CON").

e.    to perform its managerial duties "in good faith, in a manner
it reasonably believes to be in the best interests of the
Company [*i.e.*, the Bayou Hedge Fund], and with such care
as an ordinary prudent person in a like position would use
under similar circumstances.

56.    The Operating Agreements also provided for a uniform choice of law (Delaware)

and similarly purported to disclaim liability for loss or damage unless such was the result of

"fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by [Bayou

Management]."

57.    The terms of Bayou's Subscription Agreements were similarly uniform for the

Bayou Hedge Fund Class member investors.  For example, Bayou's Subscription Agreements

also provided that the Subscription Agreement shall be governed by a uniform choice of law

(Connecticut).

58.    For example, plaintiff Broad-Bussel Family entered into a Subscription

Agreement with Bayou on December 21, 2003.  Broad-Bussel Family's Subscription Agreement

provided for, among other things, the Broad-Bussel Family's initial investment of $1,000,000 in

the Bayou Super Fund.  In accordance with its obligations thereunder, on January 5, 2004, the

Broad-Bussel Family made a $500,000 wire transfer to Citibank, credited as the Broad-Bussel

Family's initial investment in the Bayou Super Fund.  On January 8, 2004, the Broad-Bussel

Family made a second $500,000 wire transfer to Citibank; that transfer was also credited as the

Broad-Bussel Family's investment in the Bayou Super Fund.

59.    After Citibank received monies from plaintiff Broad-Bussel Family and other

Class members as investments in the Bayou Hedge Funds, Bayou Management sent such

29

investors a certificate that acknowledged the Class member's investment in the respective Bayou Hedge Fund.

60.     During the Class Period, Bayou sent members of the Class, including Plaintiffs, on a monthly basis Net Asset Valuations that purported to accurately reflect Class members' contributions, withdrawals, and profits and losses for their investments in the Bayou Hedge Funds.  However, all such Net Asset Valuation statements were false and misleading because they did not reflect Class members' true financial interests in the Bayou Hedge Funds and did not accurately portray the Bayou Hedge Funds' true financial position and results.  Moreover, such Net Asset Valuation statements were also false because they omitted to disclose, among other things, the massive trading losses that were being incurred by the Bayou Hedge Funds, the true asset valuation of the Bayou Hedge Funds, and the fact that Bayou was unlawfully and secretly converting and otherwise dissipating -- indeed, outright stealing -- millions of dollars of Class member funds.

61.     In disseminating the false monthly asset valuations, Bayou's *modus operandi* was to similarly mislead all Class member investors into believing that their investment funds were being properly maintained and invested when, in fact, the opposite was true.  Moreover, and throughout the Class Period, Bayou also communicated financial and other information about Bayou and the Bayou Hedge Funds to the Class via weekly newsletters, monthly reports, quarterly reports, annual reports and investor conference calls, all of which similarly omitted material adverse information about Bayou and the Bayou Hedge Funds in order to mislead Class member investors into believing the Bayou Hedge Funds were being operated properly and in accordance with the law.

62.    During the Class Period, Bayou represented to the Class that independent financial audits of Bayou and the Bayou Hedge Funds were properly and timely being conducted. In certain instances, Bayou even requested Class members to assist in those so-called independent audits.

63.    For example, on or about February 14, 2004, Israel sent plaintiff Broad-Bussel Family a confirmation letter stating that Bayou's auditors were engaged in an examination of Bayou's financial statements and thus wanted to confirm material information covering investor capital accounts. The confirmation letter reflected the $1,000,000 investment that the Broad-Bussel Family made in January 2004. The letter requested that the Broad-Bussel Family confirm the contribution information directly to Bayou's auditor, Richmond-Fairfield.

64.    However, contrary to Bayou's representations, the Bayou Hedge Funds were not being independently audited during the Class Period. Bayou omitted to disclose that no audits of the Bayou Hedge Funds were being performed and that Richmond-Fairfield, the purported auditor, was not independent but was simply a sham company set up by Marino.

65.    On or about July 27, 2005, Israel sent Class member investors, including Plaintiffs, a letter that abruptly announced that the Bayou Hedge Funds would be closed at the end of July 2005. In that letter, Israel made false assurances that, among other things, "[u]pon completion of the final audit, all investors will receive a 100% payout of their investments", and that Bayou would "send updates to the investors while the audit is in progress indicating an anticipated date of final payments." Israel also falsely praised Bayou's financial and fiduciary performance for its investors, stating specifically that "I feel we have done an admirable job in the stewardship of the funds with which we have been entrusted and hope that you agree."

31

66.     On or about July 29, 2005, Israel sent Class member investors, including

Plaintiffs, a letter stating that the process of liquidating the Bayou Hedge Funds requires an

auditing and closing process that could take four months or even longer.  However, the letter

stated that at least partial distributions of Class members' investments could begin by mid-

August 2005.  That letter also falsely assured investors that "the final results [and resulting

distribution] will not be materially different from the information furnished to you in your June

[2005] statement."

67.     In or about August 2005, Bayou Management sent Class member investors,

including Plaintiffs, a final Net Asset Valuation statement for their investments in the Bayou

Hedge Funds.

68.     On or about August 2, 2005, Israel sent members of the Class, including

Plaintiffs, a letter dated that same day falsely stating that "[t]he auditors are now conducting the

final audit of the Bayou Family of Funds."  Those letters also included investment information

regarding Class members' Bayou investments and requested that Class members confirm the

investment information using a self-addressed enclosed envelope.  That envelope was addressed

to "Richmond-Fairfield Associates, 575 Madison Avenue, Suite 1006, New York, NY 10022-

2511".

69.     On or about August 11, 2005, Israel sent members of the Class, including

Plaintiffs, a letter stating that it planned to distribute 90% of the proceeds from the liquidation to

investors beginning on August 17, 2005.  As with the other prior specific communications set

forth above, this letter was materially false and misleading because, among other things, Bayou

had no intention of properly making such distributions.

### The Truth Begins to be Revealed

70.     On August 25, 2005 -- the close of the Class Period -- *The New York Times* shocked Class members and other investors by reporting that "[s]tate and federal officials in Connecticut are investigating the possible collapse of the Bayou Group, a hedge fund and brokerage firm in Stamford that managed an estimated $400 million for its investors". The article reported that "[c]lients of the Bayou Group apparently grew concerned about the firm's status in recent days, when refund checks it had sent to customers could not be drawn upon for lack of funds".

71.     On August 27, 2005, *The New York Post* reported that federal agents had seized boxes of records and other material from Bayou's offices in Stamford, Connecticut, amid fears that up to $500 million of its investors' money has "disappeared". Reportedly, witnesses said that those Bayou offices had employed some 15 to 20 people; however, by the time of the raid, the offices had been stripped bare of their contents and had actually been vacant for weeks. The article also reported that "[n]early everyone involved with Bayou Securities LLC has vanished - including its founder, Samuel Israel III ... [a]nd those who could be found aren't talking."

72.     On August 29, 2005, *The Wall Street Journal* reported that a "suicide note and confession" had been found at offices of Bayou Management. That suicide note/confession was supposedly written by Marino, directly implicated Marino, Israel and Marquez, and consisted of a six-page account of some of the details of financial fraud that had been conducted by Bayou beginning in 1996 (the "Marino Confession"). It was reported that Eric Dillon, a money manager for Silver Creek Capital LLC in Seattle, Washington, had found the Marino Confession on

33

August 16, 2005 and that federal and local authorities had commenced investigations regarding the Bayou fraud based in part on the Marino Confession.

73.    As reported in *The Wall Street Journal* on the August 29, 2005, the Marino Confession begins with the statement, "This is my suicide note and confession", and went on to make numerous shocking revelations including, among others:

a.    On the last trading day in December 1998, Israel held a frantic meeting with Marino and Marquez. Marino recalled that all three men knew Bayou's situation was dire -- in that the Bayou Hedge Funds' losses had vastly overwhelmed their gains for at least more than two years. In addition, Marino recalled that just three months earlier, another hedge fund known as Long-Term Capital Management had collapsed, causing widespread disruption in the financial world. Marino summed up the situation in plain words: "Something had to be done, and fast."

b.    According to Marino, the solution, devised by Israel and Marquez, was simple: produce a fake audit of the funds' performance, and try to make up the losses the following year. The plan to recoup Bayou's past trading losses, as outlined by Marino, involved two steps. First, Israel would raise fresh funds from investors and trade his way to outsized gains on that money. Second, at least part of the commissions generated by the Bayou Hedge Funds' trades -- which were executed by Israel's own brokerage firm, Bayou Securities -- would be credited back to the Bayou Hedge Funds to help offset and hide the losses. Those commissions were substantial given Israel's daily "rapid-fire trading" activity. However, in order to engage in such a blatant fraud, Bayou determined that the existing outside auditor, Grant Thornton LLP, would need to be replaced by a newly-created bogus accounting firm -- Richmond-Fairfield.

c.    Israel, Marino and Marquez then quickly implemented their fraudulent

plan. With that plan in place, Bayou falsely reported its 1998 performance to investors as

representing a gain of 17.55%, with December 1998 being touted as an especially good month,

showing a profit of 3.14%.

74.    For a period of time, Bayou's Ponzi scheme provided significant cash flow from

Bayou's new investors. Israel and Marino used significant amounts of that cash flow to fund

their own extravagant life styles. For example, by 2003, Marino, who had previously been

driving a used Maxima and living at his mother's house in Staten Island, began driving Bentley

and Ferrari automobiles and moved to a six-bedroom home in Westport, Connecticut acquired

for some $2.9 million -- which he paid for in large part with Class member investors' cash.

Similarly, that same year, Israel, who was then in the midst of a marital divorce, moved into a

luxury estate that had originally been built for ketchup magnate H.J. Heinz -- at a cost of $32,000

per month, again subsidized or largely paid by Class member investors' cash.

75.    During the Class Period, Israel and Marino created entities that were used to

unlawfully receive Class members' Bayou investor funds, and thereafter either converted those

funds personally to their own use or invested those funds in other investments for their own

personal interests. For example, Israel and Marino wrongfully funneled some $40 million to IM

Partners during the period in or about 2003 to 2004. In addition, Israel and Marino converted

significant portions of those proceeds for their own personal use, and invested other such

proceeds for their own personal benefit in several other companies, including firms such as

Kycos Ltd., Debit Direct Ltd., Adam Aircraft, GS Capital, Vectrix, and other entities, despite

knowing that these funds were beneficially owned by Class member investors. Similarly, Israel

35

and Marino funneled other Bayou investor monies to IMG which were likewise wrongfully converted and used to make additional private investments for the personal benefit of Israel and Marino. In fact, Israel and Marino reportedly created IM Partners and IMG for the express purpose of helping conceal and launder the assets they stole from Class members, and in fact used IM Partners and IMG expressly for such purposes.

76.    Over time, Bayou's scheme began to unravel as new investments were outpaced by investment withdrawals, expenses, losses and unlawful conversions. In or about April 2004, Bayou made a last-ditch effort to keep their scheme afloat. Without informing Plaintiffs or other Bayou investors, Bayou then secretly stopped all securities trading and liquidated the Bayou Hedge Funds. At or about that same time, Bayou then transferred the remaining proceeds of the Bayou Hedge Funds directly to Israel, with the substantial assistance and direct participation of Citibank.

77.    In or about April 2004 -- following Bayou's liquidation of the Bayou Hedge Funds -- Israel and Marino instructed Citibank to transfer $150 million from the Bayou bank accounts held at the Citibank branch in Bronxville, NY. Israel and Marino wired those funds to a trading account at Barclay's Bank in London. Thereafter, Israel and Marino reportedly transferred the $150 million back to Bayou's Citibank accounts in Bronxville.

78.    Following those initial transfers, Citibank then permitted Israel to personally withdraw many millions of dollars of Class member investor funds, and transferred such funds to bank accounts individually owned by, and under the sole control of, Israel. Indeed, according to a September 1, 2005 article in *The Wall Street Journal*, Bayou reportedly emptied five Bayou accounts held by Citibank over the course of six days, withdrawing some $161 million. Four of

those accounts held money for -- and, very significantly, *explicitly and directly in the name of* -- four specific Bayou Hedge Funds (Bayou Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund and Bayou Accredited Fund), and the fifth account held money directly in the name of Bayou Management.

79.    Citibank permitted Israel to personally withdraw and transfer those funds to accounts he himself alone owned and controlled.  Specifically, on or about July 8, 2004, Citibank directly wired $120 million from Bayou's Citibank accounts in New York to one or more offshore bank accounts in Israel's name personally at Deutsche Postbank in Hamburg, Germany. Other transfers of Class member investor funds from the Citibank accounts, including an additional $32 million wire transfer reportedly somewhere within the United States, are unaccounted for.

### Laundering of Converted Proceeds

80.    After draining the Bayou bank accounts, Israel and Marino began a series of additional covert transactions aimed at laundering the $161 million by transferring those monies through bank accounts in financial institutions around the world, including New York, London, Germany, Hong Kong, Pennsylvania and New Jersey.  Ostensibly, the transactions were purported to relate to legitimate private placement programs, which were to produce "above average returns -- and in some cases, 100% per week".  In reality, however, the funds being transferred by Israel and Marino were part of an elaborate scheme to unlawfully launder the remaining assets of the Bayou Hedge Funds through several financial institutions in connection with their illegal conversion of those monies.

81.    In May 2005, the Arizona Attorney General seized $101 million from several Wachovia Bank accounts in Flemington, New Jersey. In an August 30, 2005 press release, the Arizona Attorney General stated that the assets had been seized "after an investigation indicated the funds might be involved in a complex financial fraud". Following the seizure of the $101 million from Wachovia by the Arizona Attorney General in May 2005, Israel and Bayou Management have filed claims for those monies with the Arizona Superior Court.

82.    On September 29, 2005, Israel and Marino both pleaded guilty to felony criminal charges that they "defrauded investors in the recently collapsed Bayou group of hedge funds of more than $450 million." In pleading guilty to the multiple-count felony informations filed by the United States Attorney in Manhattan:

a.    Israel admitted "that he conspired with MARINO, the 45-year-old Chief Financial Officer and Chief Operating Officer of Bayou, to defraud investors by creating false financial statements that were distributed to investors", and that "between 1996, when the funds were set up, and 2005, when the funds collapsed, the funds sustained consistent losses, but, at his direction, investors were regularly told that the funds were reaping substantial gains."

b.    Marino admitted "that he and ISRAEL, along with another former employee and co-founder of the Bayou Funds, hatched the scheme after the funds began sustaining losses. At the time, the three agreed that MARINO, a Certified Public Accountant, would form a sham certified public accounting firm named Richmond-Fairfield Associates, to sign off on the false financial statements showing fake profits that were used to lure future and current investors."

38

c.      Israel pleaded guilty to criminal conspiracy, mail fraud and investment advisor fraud.  Marino pleaded guilty to conspiracy, mail fraud, wire fraud and investment advisor fraud.  As a result, each faces a possible sentence of 30 years in prison.  In addition, both Israel and Marino also face fines on each count of $250,000 or twice the gain or loss resulting from the crime; an order of restitution; and forfeiture of the proceeds of their admitted fraudulent scheme, among other things, including by the U.S. Attorney's office for the Southern District of New York.  Reportedly, Israel and Marino are scheduled to be sentenced for their crimes in April 2007.

### Bayou's Material Misrepresentations and Omissions

83.     During the Class Period, Bayou made numerous material misrepresentations and omissions regarding the financial results, operations and conditions and the business practices of the Bayou Hedge Funds (the "Misrepresentations and Omissions").  These Misrepresentations and Omissions were made as part of a consistent, uniform scheme to all members of the Class and included, among others, the following:

a.      Bayou reported fictitious rates of return for the Bayou Hedge Funds in quarterly reports and mailed those reports to members of the Class.

b.      Bayou reported fictitious rates of return for the Bayou Hedge Funds in weekly newsletters and e-mailed or faxed those newsletters to members of the Class.

c.      Bayou reported individual investors' inflated accumulated profits in monthly reports and mailed those reports to members of the Class.

d.      Bayou mailed annual financial statements to members of the Class that contained, among other misrepresentations:  (i) inflated rates of return on trading; (ii) inflated net

39

asset values, and (iii) false certifications that Bayou had been independently audited by a certified public accounting firm, Richmond-Fairfield.

       e.      Bayou falsely told investors that the Bayou Hedge Funds were properly audited. In fact, beginning in or about early 1999, Bayou created the phony accounting firm Richmond-Fairfield Associates and, contrary to the Bayou's representations, neither Richmond-Fairfield nor anyone else conducted independent audits of the Bayou Hedge Funds during the Class Period.

       f.      Bayou omitted to disclose the true financial results and conditions of the Bayou Hedge Funds and the true net asset valuations for Class members' investments in the Bayou Hedge Funds, as well as the facts that the Bayou Hedge Funds were not being independently audited, that Richmond-Fairfield was a sham company, and that the reported results of the Bayou Hedge Funds were wholly fictitious.

       g.      Bayou also omitted to disclose that in or about the spring of 2004, Bayou ceased all trading for the Bayou Hedge Funds, liquidated all investments in the Bayou Hedge Funds, and withdrew all of the remaining monies from the Bayou Hedge Funds' bank accounts at Citibank, without being authorized to do so and without informing -- but instead affirmatively and fraudulently concealing their scheme from -- the members of the Class.

       h.      Bayou omitted to disclose that between in or about the fall of 2003 and in or about May 2005, Bayou entered and attempted to enter into private financial transactions using money from the Bayou Hedge Funds without authorization and without disclosing to Class member investors the nature of those transactions.

i.    Bayou also omitted to disclose that from in or about July 1996 through in or about August 2005, Bayou fraudulently induced members of the Class to contribute in excess of $450 million to the Bayou Hedge Funds and Bayou then wrongfully converted significant portions of those monies for Bayou's and Israel's and Marino's own personal use.

84.    As one specific example of Bayou's misstatements, Bayou told investors that the purported "audited" financial statements of the Bayou Super Fund for the year ended December 31, 2003 reported fund assets of approximately $192 million and a net trading gain of some $27 million. In truth, however, Bayou omitted to disclose that the Bayou Super Fund actually had less than $54 million in fund assets for year end 2003 -- not even one-third of the falsely reported value -- and had not experienced a trading gain, but instead had suffered a loss of $35 million.

85.    The reports created and distributed by Bayou during the Class Period were materially false and also violated numerous of the most basic tenets of GAAP, including but not limited to the following:

a.    that revenue can only be recognized if the revenue has been earned and is collectible (CON 5, ¶ 83);

b.    that financial reporting should provide information that is useful to present and potential investors, creditors, and other users in making rational investment, credit, and similar decisions (CON 1, ¶ 34);

c.    that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON 1, ¶ 40);

41

d.      that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (CON 1, ¶ 50);

e.      that financial reporting should provide information about an enterprise's financial performance during a period (CON 1, ¶ 42);

f.      that financial reporting should be relevant and reliable in that it represents what it purports to represent -- a notion that is central to accounting (CON 2, ¶¶ 58-59); and

g.      that financial reporting should be complete, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON 2, ¶ 79).

### The Hennessee Defendants Improperly Investigate and Recommend the Bayou Hedge Funds

86.      The Hennessee defendants held themselves out to Plaintiffs and the investing community generally as highly experienced and competent experts, even self-proclaimed "pioneers", in hedge fund consulting.

87.      For example, the Hennessee Group website posted an open letter to investors, signed by defendants Lee Hennessee and Gradante, which states in pertinent part (emphasis altered):

> [W]e are committed to a singular mission: achieving the investment goals of our clients by applying the expertise, creativity and commitment of our people.
>
> The investor is our client. ***Our clients trust us to establish realistic investment objectives and develop diversified hedge fund portfolios. To achieve these goals, we apply our time tested advisory processes and proprietary research tools.***

*We are "your strategic partner" in hedge fund investing.*

Sincerely,

E. Lee Hennessee and Charles J. Gradante[.]

88.     The Hennessee Group website further boasted that (emphasis added):

Since the beginning, we have been navigating a course of action that balances risk and return among a well diversified hedge fund portfolio. *We have the expertise and experience* to provide clients with a range of investment advisory services, which integrates portfolio size, objectives and suitability.

89.     The Hennessee Group also touted its services specifically to Plaintiffs and the members of the Class based on the supposedly superior research, due diligence and monitoring services that it provides (emphasis altered):

In order to understand your portfolio's performance, you need to see more than just returns; you should be able to understand how the returns were achieved and what factors affected them.

*We provide clients with various research tools:*

*Performance analytics*
*Comparative analyses*
*Manager newsletters and interviews*
*Risk assessments*
*Due diligence reports*
*Monthly client statement "monitors".*

90.     The Hennessee defendants also touted publicly the value of the consulting and advisory services they provide to hedge fund investors. For example, defendant Gradante provided a written submission to the SEC in connection with a "Roundtable on Hedge Funds", held on or about May 14-15, 2003 in Washington, D.C. Among other things, Gradante claimed that hedge funds consultants, like the Hennessee defendants, are "value added" in providing investors with guidance and advice:

43

The value that hedge fund consultants provide is similar to the value consultants provide pensions, endowments, foundations, and government entities, which is fundamentally the analysis of the customer's investment needs and assistance in determining asset allocations, manager selection, and ongoing monitoring.

Gradante then also further espoused the "special value" of hedge fund consultants, such as the Hennessee defendants, based on the unique characteristics of hedge fund investments, stating as follows:

- The hedge fund industry "is relatively difficult to learn about from public information."

- Because hedge funds are "less transparent" than other investments, consultants "can provide discernment about a strategy."

- "The instruments and strategies used by hedge funds can be generally more complex than what you find in traditional money management, so hedge fund consultants can be valued added in identifying inherent strategy risk."

- "Determinations about suitability and what is in the best interest of the client can be a difficult exercise without a consultant."

- Hedge fund consultants "provide professional expertise in evaluating investment opportunities".

91.    The Hennessee defendants, including specifically defendants Lee Hennessee and Gradante, told Broad-Bussel Family and other members of the Class that the integrity, skill, expertise and fidelity of a hedge fund were factors critical to their recommending hedge fund investments. Moreover, defendants Lee Hennessee and Gradante marketed themselves personally to Plaintiffs and the Class as being experts in analyzing fund managers and selecting appropriate hedge fund investments for their clients. Further defendants Lee Hennessee and Gradante personally solicited plaintiff Broad-Bussel Family and other members of the Class to

44

make investments in the Bayou Hedge Funds and personally purported to investigate Bayou for Plaintiffs and the other members of the Class.  Consequently, the Hennessee Group was simply the alter ego of defendants Lee Hennessee and Gradante.  Absent the purported reputation, skill and expertise of defendants Lee Hennessee and Gradante and their alleged experience in properly investigating hedge fund investments, Plaintiffs and members of the Class would not have sought advisory services and hedge fund recommendations from the Hennessee defendants.

92.    The investment advisory agreements that the Hennessee Group entered into with members of the Class included material terms that were uniform among the Bayou Hedge Fund Class member investors.  For example, those investment advisory agreements obligated the Hennessee Group to perform due diligence investigations and ongoing monitoring of investments recommended by the Hennessee Group, including, among other things, as follows (emphasis added):

a.    "*provid[e] advice* to Client concerning investments in one or more private investment partnerships (each a "Hedge Fund" and collectively, the "Portfolio').  These services include the initial selection of each Hedge Fund and *ongoing monitoring* of the performance of the Portfolio";

b.    "*perform search, evaluation, selection, and introduction services* (collectively, "Structuring Services") and introduce Client to one or more Hedge Fund(s) that Hennessee *reasonably believes* would be appropriate investment vehicles for Client to use based upon the investment objectives of Client"; and

c.    provide "Ongoing Services to the Client, such as its obligation to "*monitor* the performance of the Portfolio selected by Client and provide *continuous and ongoing* Hedge Fund investment advice".

45

93.     By virtue of the Defendants' superior knowledge and expertise, their representations to the members of the Class, their roles in rendering financial and advisory services to the members of the Class and their status as registered investment advisors with purportedly expert knowledge about the hedge fund industry, the Defendants owed fiduciary and other duties to the members of the Class.  These duties included, among other things, the obligations to:  investigate the business practices and financial condition of the investments they recommend; monitor those recommended investments which are made by their clients; render honest and properly investigated financial advice regarding investments by the members of the Class; and assist Class member investors in good faith in managing their investment funds.

94.     In rendering their services to the Class, the Defendants recommended that members of the Class invest in the Bayou Hedge Funds, even if making such an investment required a withdrawal of funds from an existing investment previously recommended by the Defendants or other parties.  In response to and reliance upon such recommendations, Plaintiffs and other members of the Class invested in the Bayou Hedge Funds.

95.     In making these investment recommendations, the Defendants provided the members of the Class with false information regarding the Bayou Hedge Funds' purported financial results, operations and condition.

96.     For example, the Defendants touted the business model and operations of the Bayou Hedge Funds, including the Bayou Super Fund.  The Defendants also advised that the recommended Bayou Super Fund was a relatively liquid investment vehicle and that fund withdrawals can be made on a monthly basis simply with a 15 day advance notice.  The Defendants advised the Class as to the total assets of that fund and that the personal investment

commitment in that Fund by the portfolio manager, *e.g.*, Bayou Management and Israel, was "Significant".

97.     The Defendants also advised the Class that the Bayou Super Fund uses "a high velocity trading strategy, based on a proprietary model with constant human overlay". The Defendants further explained that "[b]efore the markets open, the investment team formulates a trading strategy for the day based on news, SEC filings, insider activity, industry reports, etc." The Defendants assured Plaintiffs and the members of the Class in marketing materials that investment risk was controlled and monitored by Bayou Management, in that, among other things, "[long/short investment] exposures are frequently brought down to zero by the closing bell, to prevent gap up/downs" and that "[t]he fund cuts back exposure if daily losses are in the 1% - 1.5% range."

98.     Hennessee represented to the Class that the Bayou Super Fund was based on an "Opportunistic" style, a characterization which was defined by Hennessee's marketing materials to mean:

> Long/short equities managers who maintain a flexible net exposure to reflect changing dynamics of the market on a minute-to-minute or daily day trading basis. Managers typically utilize technical and/or fundamental analysis. Portfolio turnover can be high as managers implement trading disciplines such as tight stop losses and defined exit target prices.

Hennessee represented that the Bayou Super Fund had a "Low/Moderate" expected volatility.

99.     Hennessee also touted the historical financial performance of the Bayou Super Fund, providing non-publicly available monthly and annual investment returns for the years 1997 through 2003, including for example specifically as follows:

| Year | Investment Performance |
|---|---|
| 2003 | 10.66% |
| 2002 | 11.22% |
| 2001 | 7.05% |
| 2000 | 19.62% |
| 1999 | 26.06% |
| 1998 | 17.55% |
| 1997 | 32.52% |
| Annualized Compound Return (1997-2003) | 18.22%. |

100.    Hennessee also directly facilitated the Bayou investments of Plaintiffs and the members of the Class.  For example, Hennessee made direct requests to Bayou for Bayou offering documents on behalf of members of the Class.

101.    The Defendants knew that the integrity, skill, expertise and fidelity of the Bayou Hedge Funds, their manager, Bayou Management, and its officers -- including in particular Israel -- were critical to a proper due diligence analysis and recommendation of investments in the Bayou Hedge Funds.

102.    Following the time the members of the Class invested in the Bayou Hedge Funds, Hennessee transmitted other false and misleading information, all of which omitted to disclosed adverse material facts about Bayou and the Bayou Hedge Funds, including as described more fully below.

### The "Red Flags" Regarding Bayou's Misconduct
### Which the Hennessee Defendants Missed or Ignored

103.   The members of the Class relied on the expertise of the Hennessee defendants to investigate, analyze and timely report material information regarding the Bayou Hedge Funds.

104.   The Hennessee defendants failed to conduct a proper due diligence review of the Bayou Hedge Funds, Bayou Management and Bayou's principal officers, including in particular, Israel and Marino.  Similarly, the Hennessee defendants failed to properly monitor and advise Class members concerning their investments in the Bayou Hedge Funds, despite the fact that Plaintiffs and other Class member investors specifically retained them to perform properly such an investigation.  In failing to conduct proper due diligence reviews and ongoing monitoring of the Bayou Hedge Funds, Bayou Management and Bayou's principal officers, the Hennessee defendants failed to uncover or ignored numerous "red flags" (the "Red Flags") that were either indicative of Bayou's misconduct, or should have led the Hennessee defendants to investigate further and timely communicate adverse information to the members of the Class, examples of which include the following:

a.      The Paul Westervelt Action:  On or about March 26, 2003, Paul Westervelt, Jr. ("Westervelt") and his son, Paul Westervelt, III, filed a civil lawsuit in Louisiana federal court (No. 03-0860 (E.D. La.)) against Israel, Marino, Bayou Management, Bayou Fund and Bayou Securities, alleging breach of contract, unjustified employment termination and violation of Louisiana's Whistleblower Statute, L.S.A.-R.S. 23:967 (the "Westervelt Action").  Westervelt alleged that he was hired in or about September 2002 to serve as a principal of Bayou in connection with hedge fund management.  According to paragraph 13 of the Westervelt complaint, after being hired Westervelt "discovered what he perceived to be possible violations

49

of S.E.C. regulations governing the operation of hedge funds, as well as other perceived possible violations of S.E.C. and N.A.S.D. rules and regulations." In addition, Westervelt allegedly "observed Marino engaged in [certain unspecified] conduct toward the other employees of Bayou on numerous occasions" that could "expose Bayou ... to potential civil liability." Westervelt, as a Bayou principal, requested that Israel and Marino provide him with access to "financial documentation relating to Bayou, including income statements, balance sheets, monthly account statements and other financial documents evidencing the ongoing business activities of Bayou"; in response, Israel and Marino denied those requests, and reportedly "deliberately obstructed" Westervelt's attempts to access those requested documents. Nevertheless, Westervelt was able to obtain certain documentation which showed that (emphasis added):

> **Bayou's capital trading account at Spear, Leeds & Kellogg ("Spear Leeds"), had been depleted by more than $7 million in December 2002. As evidenced by the December 2002 account statement ... Bayou's capital account at Spear Leeds had a balance of more than $7.8 million on December 1, 2002, and a balance of only $379,000 as of December 31, 2002 ....**

Although Westervelt repeatedly asked Israel and Marino to explain this capital account depletion, Westervelt never received any explanation or further information. Further, the Hennessee defendants failed to alert their Class member investor clients to even the existence of these proceedings and allegations -- despite being hired for the very purpose of uncovering and advising their investor clients precisely concerning such types of Red Flags.

      b.     <u>Bayou's Statement Regarding the Westervelt Action</u>: On or about November 3, 2004, Israel, in his capacity as the so-called General Partner of the Bayou Group, sent a letter to investors of the Bayou Hedge Funds to address the Westervelt Action. That letter

was also sent to and/or received by the Hennessee defendants. Israel's letter attempted to defuse any negative impact that had been created by the Westervelt Action by trying to discredit Westervelt personally and by denying all allegations of wrongdoing. For example, Israel claimed that Westervelt had been hired by Bayou because of Westervelt's "self-described deteriorating situation" with his prior employer; however, Westervelt alleged that he "agreed to leave his successful business arrangement" with his prior employer in exchange for Bayou's promise to pay him an annual salary of $800,000 and give him an immediate 25% ownership in Bayou Management (Westervelt Complaint, ¶ IX). Also, Israel claimed that Westervelt was fired because he "would simply not follow the Bayou trading methods"; however, Westervelt alleged that he resigned essentially because he refused to participate in the illegal conduct being committed by Israel, Marino and the other Bayou principals. Israel's letter also noted that another Bayou employee, Ray Oelkers ("Oelkers"), had also been fired by Israel and that Oelkers had also filed a lawsuit. Israel similarly insinuated that Oelkers needed a job, and that Israel hired Oelkers but then fired him because Oelkers refused to perform "[t]he duties and responsibilities of the position ... outlined for him" -- in other words, Oelkers refused to participate in Bayou's fraud. In sum, such allegations and counter-allegations are precisely the type of information that the members of the Class relied upon the Hennessee defendants to investigate, uncover, analyze and, at a minimum, timely advise their client investors of.

      c.    Admitted Conflicts of Interests: Israel acted as the Chief Investment Officer, manager and head trader for the Bayou Hedge Funds. The securities brokerage and trading functions for the Bayou Hedge Funds were performed by Bayou Securities, which during the Class Period was owned by Israel. The Bayou Hedge Funds' proclaimed "trading strategy"

consisted of daily, continual high-volume trading activity -- thus resulting in substantial

corresponding commissions for Bayou Securities, and in turn substantial income personally for

Israel. In other words, the more that Israel churned, or turned-over, the stock portfolios of the

Bayou Hedge Funds, the more commissions he would earn. In fact, according to the Marino

Confession, in or about 1997 and 1998, Bayou fraudulently funneled portions of Bayou

Securities' hefty commissions back to the Bayou Hedge Funds to help conceal trading losses. As

the fraud grew, Bayou ceased funneling those commissions in or about 1998 and simply reported

wholly fictitious financial results and balances for the Bayou Hedge Funds, with Israel still

retaining personally substantial revenues from those commissions. Such false financial reports

were made possible because Bayou falsely reported that the data had been audited by an

independent accounting firm, Richmond-Fairfield -- which in actuality was a bogus company that

was created, owned and registered by Marino, and which never properly performed, or even

could perform, such audits.

        d.     <u>Phoney Audit/Accounting Firm</u>: Richmond-Fairfield was formed in or

about 1998 by Marino with the direct approval and participation of Israel and Marquez.

Richmond-Fairfield was formed specifically in order to help conceal Bayou's expanding fraud.

In fact, New York state regulatory filings show that the firm was not even registered with the

state of New York, or any other state, until October 10, 2000. Moreover, those regulatory filings

show that the owner of Richmond-Fairfield is Bayou's CFO, Marino. As Marino has admitted,

he and Israel concocted this phoney accounting firm in order to facilitate their financial fraud.

Among other things, the phoney firm provided false audit opinions that certified that Bayou's

financial statements, reported profits, and fund valuations were fairly stated and had been prepared in accordance with GAAP.

e.    <u>Complete Absence of Verification</u>:  The Hennessee defendants did not obtain any independent verification or confirmation as to the Bayou Hedge Funds' asset balances or securities transactions.  Absent such verification or confirmation, the Hennessee defendants could not have performed any reasonable or meaningful due diligence or monitoring of Bayou or the Bayou Hedge Funds.  At a very minimum, the lack of any such verification or confirmation should have caused the Hennessee defendants to further investigate and advise Plaintiffs and the members of the Class that the Hennessee defendants did not obtain such verification or confirmation, and that they therefore had not performed any meaningful due diligence and monitoring of the Bayou Hedge Funds.  Nevertheless, Plaintiffs and the members of the Class invested in Bayou based upon the Hennessee defendants' recommendations and in reliance on the Hennessee defendants' reputation, skill and purported investigation of Bayou.

f.    <u>Bayou Used Paid Promoters</u>:  According to materials provided to the Hennessee defendants by Bayou during the Class Period, Bayou acknowledged that it retained several outside marketers and promoters for the Bayou Hedge Funds and paid those persons based either on a percentage of assets raised or through commissions to the promoters' designated brokers/dealers.  These practices created clear conflicts of interest, but the Hennessee defendants failed to investigate and advise properly Plaintiffs and the members of the Class.  These paid promoters included, among others, Aris Partners, Altegris Investments and Consulting Services Group, some or all of whom reportedly received as much as 3% of the assets they raised.

g.    Israel's Falsified Resume:  Bayou falsified and materially embellished the professional credentials and biographical information regarding Israel -- the manager and Chief Investment Officer of the Bayou Hedge Funds.  Indeed, there are several material discrepancies between Israel's *curriculum vitae* that was included in the Bayou Group's marketing materials for the Bayou Hedge Funds, which was received by the Hennessee defendants, as compared to the C.R.D. that was on file with securities regulators.[3]  For example, the biography Israel used to help market the Bayou Hedge Funds to investors omits several of his prior employers and his history of bouncing from one brokerage firm to another, and falsely stated that Israel had been a head trader at the respected hedge fund Omega Advisors and exaggerated the period of time that Israel worked for that entity.

h.    Bayou's Falsified Company History:  Bayou also falsified the history of Bayou and the Bayou Hedge Funds.  These falsified data were used to distort Bayou's true operating history in order to gloss over and conceal Bayou's track record of poor performance.  For example, Bayou gave prospective investors, including members of the Class, documents that falsely stated that Israel started the Bayou funds in 1997.  In fact, the Bayou funds actually began in 1996.  However, Israel and Bayou had delivered such a poor performance prior to 1997 that Bayou simply blotted out the 1996 operations entirely from Bayou's reported history.

i.    Prior Regulatory Violation and Fine:  On September 10, 2003, the Connecticut Banking Commissioner entered a Consent Order with respect to Bayou Securities.  The Consent Order stated that Bayou Securities, a Connecticut-registered broker-dealer, failed to

---

[3]    C.R.D. is a regulatory filing maintained by the NASD that reports the qualification, employment and disclosure histories of registered securities employees of NASD member firms.

keep the records required by Section 36b-31-14a(a) of the Regulations under the Connecticut Uniform Securities Act. The Consent Order required that Bayou Securities pay $7,500 to the department as an administrative fine and provide the Securities and Business Investments Division with copies of any customer complaints on a quarterly basis for two years.

        j.     <u>Unusually Favorable Fees and Restrictions</u>: Bayou offered unusually favorable fees and terms for the Bayou Hedge Funds, which successfully served as enticements for investors, including members of the Class, to choose the Bayou Hedge Funds over other hedge funds. Indeed, according to the Marino Confession, such favorable terms were used precisely to induce Class member investments. For example, unlike most hedge funds, Bayou did not charge investors the traditional hedge fund management fee of 1% to 2% of the investment assets, plus a percentage of the gains the fund realizes. Instead, Bayou claimed to limit its fees to 20% of the funds' gains. However, in actuality, this meant that the more fictitious gains Bayou reported, the larger Bayou's fees. In addition, the minimum investment Bayou required of its investors was $250,000 -- an amount that was much smaller than the $1 million minimum used by other funds. Also, Bayou did not have a long "lockup" period -- meaning that investors could enter and exit the Bayou Hedge Funds on a monthly basis, as opposed to lock-up periods of a year or more that are commonly used by other hedge funds.

       105.    The Hennessee defendants were obligated to reasonably investigate the operations, finances and history of the Bayou Hedge Funds that they recommended to the Plaintiffs and the Class. Indeed, they were hired and paid by Plaintiffs and the Class expressly for this purpose. Additionally, Plaintiffs and the members of the Class invested in the Bayou Hedge Funds, the Hennessee defendants were required to monitor such investments and advise

promptly Plaintiffs and the members of the Class of any material information concerning same and whether circumstances had materially changed regarding such investments. In fact, Plaintiffs and the members of the Class retained and paid the Hennessee defendants not only to advise them regarding the initial investments, but also to timely advise them of any events or changes thereafter so that they could make informed decisions regarding their investments.

106.    In addition to the foregoing Red Flags, the Hennessee defendants also had the ability to inspect the books and records of the Bayou Hedge Funds. Indeed, an inspection of such records should be part of any reasonable investigation for which Plaintiffs and the members of the Class retained and paid the Hennessee defendants. For example, the respective Operating Agreements governing Class member investments in the Bayou Hedge Funds provided as follows:

> The books and records shall at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Owners, or their duly authorized representatives during reasonable business hours.

107.    The Hennessee defendants failed to inspect the books and records of the Bayou Hedge Funds altogether, or at least to do so in a proper manner, and to timely advise members of the Class as to material adverse information concerning Bayou and the Bayou Hedge Funds.

108.    The Hennessee defendants wrongfully ignored or failed to uncover the foregoing Red Flags in recommending that the members of the Class invest in the Bayou Hedge Funds. Had the Hennessee defendants conducted proper due diligence and monitoring, they would have learned the truth about Bayou or further investigated and alerted members of the Class to reject investing in the Bayou Hedge Funds or to withdraw their investments in the Bayou Hedge Funds,

56

thus preventing or mitigating the damages that were ultimately suffered by Plaintiffs and the Class when the Bayou Hedge Funds collapsed in or about July 2005.

### Piercing the Corporate Veil

109.    Defendants Lee Hennessee and Gradante acted in concert with, dominated and otherwise controlled the operations of Hennessee Group.  In addition, defendants Lee Hennessee and Gradante planned, orchestrated and executed the wrongdoing as alleged on behalf of themselves individually and through Hennessee Group which, during the Class Period, Lee Hennessee and Gradante controlled and operated for their own personal benefit and as their own alter ego.  Among other things, defendants Lee Hennessee and Gradante completely dominated and controlled Hennessee Group (particularly with respect to the failure to perform proper due diligence and monitoring of the Bayou Hedge Funds).  Lee Hennessee and Gradante exercised that domination and control in connection with Hennessee Group's misconduct that resulted in the damages suffered by Plaintiffs and the Class.  Accordingly, the acts and omissions of Hennessee Group should be attributed to defendants Lee Hennessee and Gradante personally.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (For Breach of Fiduciary Duty)

110.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

111.    Plaintiffs and the Class bring this claim for breach of fiduciary duty against all three Hennessee defendants.

112.    The Hennessee defendants were fiduciaries of Plaintiffs and the members of the Class by virtue of their status as financial and investment advisors; by having been entrusted with Plaintiffs and the Class of confidential and proprietary financial and investment information; by their acts in soliciting and advising Plaintiffs and members of the Class in their investments in the Bayou Hedge Funds; by their acts and omissions in investigating, monitoring and managing Plaintiffs and the members of the Class regarding their investments in the Bayou Hedge Funds; by holding themselves out as professional and reputable experts in the field of hedge fund investments and as financial advisors; and by virtue of their superior knowledge concerning hedge fund investments generally and the Bayou Hedge Funds specifically. Plaintiffs and the members of the Class reasonably reposed trust and confidence in the integrity, fidelity and adequacy of the Hennessee defendants' business practices, including but not limited to the Hennessee defendants' purported due diligence and monitoring of Bayou and the Bayou Hedge Funds.

113.    As fiduciaries, the Hennessee defendants owed Plaintiffs and other similarly situated Class members duties of loyalty, due care and fair dealing, including, *inter alia*: to protect the interests of the Class; to refrain from doing any act injurious to, or which would deprive the Class of, any profit or advantage; to provide members of the Class with accurate and materially complete information; and to not elevate their own interests ahead of Plaintiffs and other similarly situated members of the Class.

114.    The Hennessee defendants violated their fiduciary duties to Plaintiffs and the members of the Class by, *inter alia*: failing to perform proper due diligence and ongoing monitoring for Class members' investments in the Bayou Hedge Funds; ignoring or failing to

uncover and timely disclose to Class member investors the Red Flags identified above; and failing to properly update Class members regarding their investments in the Bayou Hedge Funds, all as alleged more fully above.

115.    As a direct and proximate result of the Hennessee defendants' breaches of fiduciary duties, Plaintiffs and members of the Class were damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (For Negligence)

116.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

117.    Plaintiffs and the Class bring this claim for negligence against all three Hennessee defendants.

118.    During the Class Period, all of the Defendants owed a duty of reasonable care to the members of the Class in regard to those investors' investments in the Bayou Hedge Funds. In particular, the Hennessee defendants had a duty, among other things: to act as reasonable financial advisors to the Class; perform proper due diligence and monitoring of the Bayou Hedge Funds; properly investigate and timely alert Class members to the Red Flags alleged above; and timely advise Class members of any material developments regarding their investments in the Bayou Hedge Funds, all as alleged more fully above.

119.    The Hennessee defendants violated their respective duties to Plaintiffs and the members of the Class by failing to properly advise Class members regarding, and monitor their investments, in the Bayou Hedge Funds. Among other things, the Hennessee defendants ignored

or failed to uncover numerous Red Flags concerning Bayou's misconduct and failed to timely advise members of the Class of material adverse information regarding Bayou, all as alleged more fully above.

120.    Defendants Lee Hennessee and Gradante also owed a duty of care to Plaintiffs and other members of the Class because they personally rendered financial advisory services to Plaintiffs and other Class members; solicited Plaintiffs and other Class members to retain them for such financial advisory services; personally recommended that Plaintiffs and other Class members should invest in the Bayou Hedge Funds, including even to liquidate other existing investments and redirect such funds as investments in the Bayou Hedge Funds; and continued to recommend that Plaintiffs and other Class members maintain and even increase their Bayou investments despite the presence of the numerous Red Flags which the Hennessee defendants either knew or ignored and failed to timely and properly disclose.  In addition, defendants Lee Hennessee and Gradante are also personally liable to Plaintiffs and the members of the Class because they undertook specific acts in connection with the Bayou investments they recommended to the Class, examples of which include the following:

a.    Defendants Lee Hennessee and Gradante were responsible for personally investigating, among other things, Richmond-Fairfield and actually knew or should have known well before the August 2005 collapse of the Bayou Hedge Funds that Bayou's supposedly independent auditor, Richmond-Fairfield, was registered solely in the name of Bayou's CFO, Marino.  Nevertheless, Lee Hennessee and Gradante failed to disclose this highly material fact to Plaintiffs and the other Class members.  Moreover, Lee Hennessee and Gradante failed to properly supplement their investigation of Richmond-Fairfield and timely and properly advise the

Class after they learned or should have learned that Richmond-Fairfield was registered solely in the name of Marino.

        b.      Defendants Lee Hennessee and Gradante also investigated personally Israel's employment history, reportedly including by speaking directly with Leon Cooperman -- the head of Omega Advisors, a New York money management firm.  Nevertheless, Lee Hennessee and Gradante *failed to properly uncover basic information* and disclose to Plaintiffs and the members of the Class that Israel had materially misstated his prior employment history and credentials, including for example, that Israel was not a "head trader" at Omega Advisors, all as set forth more fully above.  To the contrary, according to recent media reports, the truth was that Israel was simply "an order taker" and that "Israel was not a fundamental stock picker, and he had no trading authority at Omega."

        c.      Defendants Lee Hennessee and Gradante also failed to properly investigate and advise Plaintiffs and the other members of the Class regarding the Westervelt Action, as alleged more fully above.  In particular, defendants Lee Hennessee and Gradante were specifically aware of the serious allegations of wrongdoing alleged in the Westervelt Action but failed to investigate properly those proceedings and advise Plaintiffs and the other members of the Class.  Indeed, after the Westervelt Action was ordered into NASD arbitration, defendants Lee Hennessee and Gradante *simply and incorrectly assumed* that such action would lead the NASD to fully "scrutinize Bayou's books", thereby relieving the Hennessee defendants of any obligation to further investigate or even alert Plaintiffs and other members of the Class regarding the highly material facts alleged in the Westervelt Action.  The Hennessee defendants' failure to further investigate Bayou in light of the Westervelt Action is particularly inexcusable given that

the Hennessee defendants knew or ignored that the NASD's jurisdiction was limited. Indeed, the NASD has stated that it never looked at Bayou's hedge-fund books because it only had jurisdiction over Bayou's NASD-registered brokerage operations.

121.    It was foreseeable that the Hennessee defendants' wrongful conduct would cause Plaintiffs and the members of the Class to suffer damages.

122.    Defendants' negligence was a substantial, direct and proximate cause of the damages suffered by Plaintiffs and members of the Class.

123.    The Hennessee defendants are directly liable for their own wrongdoing. In addition, defendant Hennessee Group is also liable under the doctrine of *respondeat superior* for the wrongful conduct of defendants Lee Hennessee and Charles Gradante, as all of the wrongdoing of defendants Lee Hennessee and Charles Gradante occurred while they were acting within their authority or apparent authority as employees or agents of Hennessee Group.

124.    By reason of the foregoing, the Defendants are liable to the Plaintiffs and members of the Class for the substantial damages they caused in an amount to be established at trial.

## THIRD CLAIM FOR RELIEF

### (For Gross Negligence)

125.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

126.    Plaintiffs and the Class bring this claim for gross negligence against solely defendant Hennessee Group.

127.    During the Class Period, Hennessee Group owed a duty of reasonable care to the members of the Class in regard to those investors' investments in the Bayou Hedge Funds.  In particular, Hennessee Group had a duty, among other things:  to act reasonable as financial advisors to the Class; perform proper due diligence and monitoring of the Bayou Hedge Funds; properly investigate and timely alert Class members to the Red Flags alleged above; and timely advise Class members of any material developments regarding their investments in the Bayou Hedge Funds, all as alleged more fully above.

128.    Hennessee Group violated its duties to Plaintiffs and the members of the Class by failing to properly advise Class members regarding, and monitor their investments, in the Bayou Hedge Funds.  Among other things, Hennessee Group ignored or failed to uncover numerous Red Flags concerning Bayou's misconduct and failed to timely advise members of the Class of material adverse information regarding Bayou, all as alleged more fully above.

129.    In addition, Hennessee Group was retained to and did, in fact, render financial advisory services to Plaintiffs and other Class members; solicited Plaintiffs and other Class members to retain it for such financial advisory services; recommended that Plaintiffs and other Class members invest in the Bayou Hedge Funds, including even to liquidate other existing investments and redirect such funds as investments in the Bayou Hedge Funds; and continued to recommend that Plaintiffs and other Class members maintain and even increase their Bayou investments despite the presence of the numerous Red Flags which Hennessee Group either knew or ignored and failed to timely and properly disclose.  In addition, Hennessee Group undertook specific acts in connection with the Bayou investments it recommended to the Class, examples of which include the following:

63

a.      Hennessee Group was responsible for investigating, among other things, Richmond-Fairfield and actually knew or should have known well before the August 2005 collapse of the Bayou Hedge Funds that Bayou's supposedly independent auditor, Richmond-Fairfield, was registered solely in the name of Bayou's CFO, Marino.  Nevertheless, Hennessee Group failed to disclose this highly material fact to Plaintiffs and the other Class members. Moreover, Hennessee Group failed to properly supplement its investigation of Richmond-Fairfield and timely and properly advise the Class after it learned or should have learned that Richmond-Fairfield was registered solely in the name of Marino.

b.      Hennessee Group also investigated personally Israel's employment history, reportedly including by speaking directly with Leon Cooperman -- the head of Omega Advisors, a New York money management firm.  Nevertheless, Hennessee Group *failed to properly uncover basic information* and disclose to Plaintiffs and the members of the Class that Israel had materially misstated his prior employment history and credentials, including for example, that Israel was not a "head trader" at Omega Advisors, all as set forth more fully above.  To the contrary, according to recent media reports, the truth was that Israel was simply "an order taker" and that "Israel was not a fundamental stock picker, and he had no trading authority at Omega."

c.      Hennessee Group also failed to properly investigate and advise Plaintiffs and the other members of the Class regarding the Westervelt Action, as alleged more fully above. In particular, Hennessee Group was specifically aware of the serious allegations of wrongdoing alleged in the Westervelt Action but failed to investigate properly those proceedings and advise Plaintiffs and the other members of the Class.  Indeed, after the Westervelt Action was ordered into NASD arbitration, Hennessee Group *simply and incorrectly assumed* that such action

64

would lead the NASD to fully "scrutinize Bayou's books", thereby relieving Hennessee Group of any obligation to further investigate or even alert Plaintiffs and other members of the Class regarding the highly material facts alleged in the Westervelt Action. Hennessee Group's failure to further investigate Bayou in light of the Westervelt Action is particularly inexcusable given that Hennessee Group knew or ignored that the NASD's jurisdiction was limited. Indeed, the NASD has stated that it never looked at Bayou's hedge-fund books because it only had jurisdiction over Bayou's NASD-registered brokerage operations.

130. It was foreseeable that the gross negligence and other wrongful conduct by Hennessee Group would cause Plaintiffs and the members of the Class to suffer damages.

131. The gross negligence of Hennessee Group was a substantial, direct and proximate causes of damages suffered by Plaintiffs and other members of the Class.

132. Defendant Hennessee Group is directly liable for its wrongdoing.

133. Defendant Hennessee Group is also liable under the doctrine of *respondeat superior* for the wrongful conduct of defendants Lee Hennessee and Charles Gradante, as all of the wrongdoing of defendants Lee Hennessee and Charles Gradante occurred while they were acting within their authority or apparent authority as employees or agents of Hennessee Group.

134. By reason of the foregoing, defendant Hennessee Group is liable to the Plaintiffs and members of the Class for the substantial damages it caused in an amount to be established at trial.

## FOURTH CLAIM FOR RELIEF

### (For Breach of Contract)

135.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

136.    Plaintiffs and the Class bring this claim for breach of contract against all three Hennessee defendants.

137.    Plaintiffs and members of the Class entered into contracts with defendant Hennessee Group for financial advisory and related services.  In addition, although Hennessee Group is the actual contracting party in those advisory agreements, defendants Lee Hennessee and Gradante so dominated and controlled the affairs and operations of Hennessee Group that they should be deemed one entity and liable as contracting parties for purposes of this claim, all as set forth more fully above.

138.    In connection with those advisory agreements, Defendants advised and recommended that Plaintiffs and the members of the Class invest in one or more of the Bayou Hedge Funds.

139.    Defendants materially breached their contractual obligations to Plaintiffs and the members of the Class by failing to properly perform the advisory, due diligence and monitoring services in accord with their contractual obligations.  For example, Defendants failed to investigate, among other things:  Bayou's prior and pending litigations; conflicts of interests in Bayou's business practices; the independence and authenticity of Bayou's purported auditor; Bayou's actual financial condition, operations and results; and the accuracy and truthfulness of Israel's resume and Bayou's company history and past regulatory violations, all as alleged more

66

fully above. Similarly, Defendants failed to disclose timely and properly to Plaintiffs and the Class the truth concerning Bayou's operations, financial condition, principals and history, all as set forth more fully above.

140. As a direct and proximate result of Defendants' contractual breaches, Plaintiffs and the members of the Class invested in and remained invested in one or more of the Bayou Hedge Funds and suffered damages thereby, including but not limited to their investment in the Bayou Hedge Funds and the fees they paid directly or indirectly to Defendants in connection therewith.

141. The contractual breaches of the Hennessee defendants were a substantial, direct and proximate cause of damages suffered by Plaintiffs and the members of the Class.

142. By reason of the foregoing, the Hennessee defendants are liable to the Plaintiffs and the members of the Class for the substantial damages they caused in an amount to be established at trial.

## FIFTH CLAIM FOR RELIEF

### (For Breach of the Implied Covenant of Good Faith and Fair Dealing)

143. Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

144. Plaintiffs and the Class bring this claim for breach of the implied covenant of good faith and fair dealing against the Hennessee defendants.

145. The Hennessee defendants were obligated to act in good faith, to deal fairly, and to adhere to the terms and spirit of the investment advisory agreements Hennessee Group entered into with members of the Class, as the common law has long recognized that an implied

67

covenant of good faith and fair dealing exists between parties to a contract. These obligations included, among other things, proper and timely financial advisory services and proper due diligence and monitoring of Bayou and the investments in the Bayou Hedge Funds made by Plaintiffs and the members of the Class. And although Hennessee Group is the actual contracting party in those advisory agreements, defendants Lee Hennessee and Gradante so dominated Hennessee Group that all three Defendants should be deemed and held liable as one entity, as described more fully above.

146.    The Hennessee defendants breached the implied covenant of good faith and fair dealing that accompanied their performance of, and obligations under, the investment advisory agreements they entered into with Plaintiffs and the members of the Class. Among other things, Defendants breached the covenant by failing to properly perform the advisory, due diligence and monitoring services in accord with the spirit of their contractual obligations. In particular, Defendants failed to investigate Bayou's prior and pending litigations, conflicts of interests in Bayou's business practices, the independence and authenticity of Bayou's purported auditor, the actual financial condition, operations and results of Bayou, the accuracy and truthfulness of Israel's resume and Bayou's company history, and Bayou's past regulatory violations, all as alleged more fully above.

147.    The breaches of the implied covenant by the Defendants were a substantial, direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class.

148.    By reason of the foregoing, the Defendants are liable to the Plaintiffs and the respective members of the Class for the substantial damages they caused in an amount to be established at trial.

## SIXTH CLAIM FOR RELIEF

### (For Violations of §§ 206 and 215 of the Investment Advisers Act of 1940 Against Defendant Hennessee Group)

149.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

150.    Plaintiffs and the Class bring this claim for violation of §§ 206 and 215 of the Investment Advisers Act, 15 U.S.C. § 80b-6 and 15 U.S.C. § 80b-15, against defendant Hennessee Group.

151.    Defendant Hennessee Group offered advisory services in connection with recommending and advising investments in the Bayou Hedge Funds, and served as a registered investment advisor under the Investment Advisers Act.

152.    Defendant Hennessee Group served as an "investment adviser" to Plaintiffs and the Class pursuant to the Investment Advisers Act.

153.    As a fiduciary pursuant to the Investment Advisers Act, defendant Hennessee Group was required to provide services to Plaintiffs and the Class in a manner in accordance with the federal fiduciary standards set forth in § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, governing the conduct of investment advisers. Section 206 provides that: "It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –

        (1)    to employ any device, scheme, or artifice to defraud any client or prospective client;

(2)    to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

\*                \*                \*                \*

(4)    to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative ....

154.    Defendant Hennessee Group breached its fiduciary duties owed to Plaintiffs and the Class by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which it knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud or deceit, upon Plaintiffs and the Class. As detailed above, defendant Hennessee Group engaged in a deceptive offering and performance of investment advisory services for Plaintiffs and the Class. Among other things, the Hennessee Group touted that it performed proper due diligence and ongoing monitoring in connection with the Bayou investments it recommended to Plaintiffs and the Class. Indeed, Plaintiffs and the Class specifically contracted with Hennessee Group to receive those services, and paid Hennessee Group compensation in connection therewith. Far from performing properly such due diligence and monitoring services, Hennessee Group failed to perform adequately such investment advisory services in recommending Bayou investments, and also ignored numerous Red Flags of Bayou's misconduct which should have been recognized and timely disclosed by Hennessee Group to Plaintiffs and the Class. Notwithstanding its failure to perform properly such investment advisory services, the Hennessee Group billed and received substantial fees from Plaintiffs and the Class in connection therewith.

155.    Hennessee Group's multiple breaches of its fiduciary duties owed to Plaintiffs and the Class, and other misconduct in deceiving Plaintiffs and the Class violated the Investment Advisors Act.

156.    As a direct and proximate result of defendant Hennessee Group's breaches, Plaintiffs and the Class invested in and maintained investments in one or more of the Bayou Hedge Funds and suffered damages thereby, including but not limited to their investment in the Bayou Hedge Funds and the fees they paid directly or indirectly to defendant Hennessee Group in connection therewith.

157.    Hennessee Group's violations of the Investment Advisors Act were a substantial, direct and proximate cause of damages suffered by Plaintiffs and the Class.

158.    By reason of the foregoing, defendant Hennessee Group is liable to Plaintiffs and the Class for violation of the Investment Advisors Act.  Accordingly, the investment advisory agreements entered into by Plaintiffs and the members of the Class on the one hand, and by Hennessee Group on the other, are subject to rescission, and defendant Hennessee Group is liable to make restitution to Plaintiffs and the Class for the fees and other compensation Plaintiffs and Class members paid under those agreements to the full extent allowable under the Investment Advisors Act.  At a minimum, Plaintiffs and the Class are entitled to recoup the advisory fees they paid previously to Hennessee Group, and set-off any present or future fees they may owe Hennessee Group, on account of Hennessee Group's violations of the Investment Advisors Act, as alleged more fully above.

## SEVENTH CLAIM FOR RELIEF

### (For Unjust Enrichment and Restitution)

159.    Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

160.    Plaintiffs and the members of the Class bring this claim against all three of the Defendants.

161.    Plaintiffs and the members of the Class directly or indirectly entered into fiduciary, legal and/or advisory relationships with the Defendants, as alleged above.

162.    Plaintiffs and the members of the Class conferred compensation and other financial benefits upon Defendants in various forms of direct and indirect fees, compensation and other charges for services that were to be rendered in connection with the Plaintiffs' investments, including in concerning Bayou.  In particular, Hennessee defendants received fees and commissions in connection with recommending Bayou as investments for Plaintiffs and the respective members of the Class.  All of the foregoing benefits were requested, voluntarily accepted, and retained by Defendants with knowledge of the material facts.

163.    Defendants derived benefits from their relationships with Plaintiffs and the members of the Class.  Through their inequitable conduct, Defendants obtained fees, compensation and other emoluments and benefits which they did not properly earn or were rightfully entitled to, and Defendants have thus been unjustly enriched.  It would be inequitable for the Defendants to retain such fees, compensation and other benefits they derived from Plaintiffs and the members of the Class in connection the Bayou Hedge Funds without repaying to members of the Class and the Hennessee the value thereof.

72

164.    By reason of the foregoing, Defendants have been unjustly enriched in an amount to be proven at trial which, in justice and fairness and in the alternative to the extent not duplicative of any of the other claims for relief requested herein, and/or to the extent Plaintiffs and the members of the Class are for any reason denied relief on account of the other claims set forth herein, should be paid over to the Plaintiffs and the other members of the Class.

## BASIS OF ALLEGATIONS

Plaintiffs have made the foregoing allegations, other than those concerning themselves, based upon the investigation of Plaintiffs' counsel which, among other things, included a review of various media reports and press releases concerning the Defendants and other persons and entities; public and other documents concerning the financial and business operations, condition and results of Defendants and other persons and entities; state and other regulatory filings regarding Defendants and other persons and entities; on-line databases and other computer research; court filings and proceedings in other litigations, including but not limited to the criminal charges against, and guilty pleas entered by, Israel, Marino and Marquez; and a review of other documents and information. Plaintiffs believe that additional evidentiary support will exist for their allegations after they are afforded a reasonable opportunity for discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the proposed Class, pray for the following relief:

1.    declaring this action to be a class action properly maintained on behalf of the Class under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as the Class representatives thereof;

73

2.    finding that Defendants committed the misconduct and violations alleged;

3.    awarding Plaintiffs and the members of the Class damages, including but not limited to compensatory, treble and punitive damages, together with interest thereon, to the maximum extent permitted by law;

4.    awarding Plaintiffs and the members of the Class their costs and expenses of this litigation, including but not limited to reasonable attorneys' fees, experts' fees and other costs and disbursements;

5.    awarding Plaintiffs and the other members of the Class rescission of the investment advisory agreements they entered into with defendant Hennessee Group and the return of all fees and other compensation Plaintiffs and the other members of the Class paid to the Hennessee Group in connection therewith in accordance with the Investment Advisors Act, and/or that the fees which Plaintiffs and the other members of the Class paid to Hennessee Group be subject to recoupment and/or set-off to the full extent permitted by law in connection with the violations alleged herein; and

6.    awarding Plaintiffs and the members of the Class such other and further relief as may be just and proper in the circumstances.

## JURY DEMAND

Plaintiffs, individually and on behalf of the Class, demand a trial by jury of all claims and

issues so triable.

Dated: March ___, 2007                    Respectfully Submitted,
       New York, NY


Of Counsel:

KOSKOFF, KOSKOFF & BIEDER, P.C.          BERGER & MONTAGUE, P.C.
William M. Bloss, Esq.
Neal A. DeYoung, Esq.
350 Fairfield Avenue
Bridgeport, CT 06604                     Merrill G. Davidoff, Esq.
Telephone: (203) 336-4421                Lawrence J. Lederer, Esq.
Fax: (203) 368-3244                      Lane L. Vines, Esq.
                                         1622 Locust Street
                                         Philadelphia, PA 19103
                                         Telephone: (215) 875-3000
                                         Fax: (215) 875-4604

                                         *Attorneys for Plaintiffs and the Class*